**Case No. 26-1328**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

SUSAN JANE HOGARTH,

*Plaintiff-Appellant,*

v.

SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as a Member of the North Carolina State Board of Elections; STACY EGGERS, IV, in his official capacity as Secretary of the North Carolina State Board of Elections; SIOBHAN O'DUFFY MILLEN, in her official capacity as a Member of the North Carolina State Board of Elections; DANIELLE BRINTON, in her official capacity as Investigator for the North Carolina State Board of Elections; OLIVIA MCCALL, in her official capacity as Director of the Wake County Board of Elections; KEITH WEATHERLY, in his official capacity as Chair of the Wake County Board of Elections; ANGELA HAWKINS, in her official capacity as a Member of the North Carolina State Board of Elections; GREG FLYNN, in his official capacity as a Member of the Wake County Board of Elections; GERRY COHEN, in his official capacity as Secretary of the Wake County Board of Elections; LORRIN FREEMAN, in her official capacity as Wake County District Attorney; FRANCIS X. DE LUCA, in his official capacity as Chair of the North Carolina State Board of Elections; STEVEN LONG, in his official capacity as a Member of the Wake County Board of Elections; DONNA WILLIAMS, in her official capacity as a Member of the Wake County Board of Elections

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of North Carolina, No. 5:24-cv-00481
Hon. Louise W. Flanagan

**Plaintiff-Appellant's Opening Brief**

James M. Dedman IV
(NC Bar # 37415)
Gallivan White & Boyd P.A.
6805 Carnegie Blvd Ste. 200
Charlotte, NC, 28211
(704)-552-1712
jdedman@gwblawfirm.com

Jeffrey D. Zeman
(Pa. Bar No. 328570)
Foundation for Individual
Rights and Expression
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
jeff.zeman@fire.org

Daniel A. Zahn
(DC Bar No. 90027403)
Foundation for Individual
Rights and Expression
700 Pennsylvania Ave. SE,
Ste. 340
Washington, DC 20003
(215) 717-3473
daniel.zahn@fire.org

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1328 Caption: Hogarth v. Hayes et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Susan Jane Hogarth
(name of party/amicus)

who is appellant, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

Not applicable.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

Not applicable.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

Not applicable.

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

Not applicable.

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

Not applicable.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Not applicable.

Signature: /s/ James M. Dedman, IV Date: April 6, 2026

Counsel for: Plaintiff - Appellant Hogarth



Print to PDF for Filing

## TABLE OF CONTENTS


INTRODUCTION ..... 1

JURISDICTIONAL STATEMENT ..... 4

STATEMENT OF ISSUES ..... 5

STATEMENT OF CASE ..... 6

- A. North Carolina law bans ballot selfies. ..... 6
- B. Susan Hogarth takes ballot selfies to share her political beliefs. ..... 7
- C. Hogarth challenges North Carolina's Ballot Selfie Ban. ..... 9

SUMMARY OF ARGUMENT ..... 14

ARGUMENT ..... 18

I. North Carolina's Ballot Selfie Ban violates the First Amendment by unjustifiably censoring core political speech. ..... 19

- A. The Ballot Photography Provisions fail strict scrutiny because they are content based but not narrowly tailored to serve a compelling state interest. ..... 21
  - 1. The Ballot Photography Provisions trigger strict scrutiny as content-based regulations of speech. ..... 21
  - 2. The Ballot Photography Provisions fail strict scrutiny. ..... 25
    - a. North Carolina lacks a compelling interest in banning voters from photographing their own ballots. ..... 26
    - b. The Ballot Photography Provisions are not narrowly tailored to achieve Defendant's purported interests. ..... 32
      - i. The Ballot Photography Provisions are not the least restrictive means of achieving the asserted interests. ..... 33
      - ii. The Ballot Photography Provisions are overinclusive and underinclusive. ..... 36

B. The Ballot Selfie Ban is not a reasonable regulation of nonpublic forum polling places. .......... 38

1. The Voting Enclosure Provision, which grants officials unbridled discretion to censor, is not reasonable. .......... 38

a. The Voting Enclosure Provision is incapable of reasoned application under *Mansky*. .......... 40

b. The Voting Enclosure Provision fails this Court's "akin to intermediate scrutiny" reasonableness test. .......... 43

2. The Ballot Photography Provisions, too, fail this Court's reasonableness test for nonpublic forums. .......... 46

II. The district court misconstrued Hogarth's complaint by ignoring her as-applied prospective claims and neglecting her facial claims. .......... 48

A. The district court ignored Hogarth's as-applied prospective claim seeking relief beyond the polling place. .......... 48

B. The district court neglected Hogarth's facial claim seeking relief against laws banning ballot selfies. .......... 50

1. Hogarth properly raised facial claims because her complaint goes beyond her own circumstances. .......... 51

2. Hogarth is entitled to a traditional equitable remedy permitted by *Ex parte Young* and reaffirmed by *CASA*. .......... 54

III. The Court should remand for entry of judgment on the pleadings for Hogarth because the Ballot Selfie Ban is unconstitutional as a matter of law. .......... 58

CONCLUSION .......... 60

REQUEST FOR ORAL ARGUMENT .......... 60

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .............................................................. 49, 50

*aaiPharma Inc. v. Thompson*,
296 F.3d 227 (4th Cir. 2002) ............................................................ 60

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .............................................................. 58, 59

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
564 U.S. 721 (2011) ..................................................................... 1

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) .................................................................... 34

*Biden v. Texas*,
597 U.S. 785 (2022) .................................................................... 58

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................................ 14, 28, 32

*Caterpillar Inc. v. Williams*,
482 U.S. 386 (1987) .................................................................... 51

*Cath. Leadership Coal. of Tex. v. Reisman*,
764 F.3d 409 (5th Cir. 2014) ............................................................ 53

*Cent. Radio Co. v. City of Norfolk*,
811 F.3d 625 (4th Cir. 2016) ............................................... 33, 36, 37

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) ..................................................... 2, 14, 24

*City of Laude v. Gilleo*,
512 U.S. 43 (1994) ...................................................................... 47

*Coal. for Good Governance v. Kemp*,
558 F. Supp. 3d 1370 (N.D. Ga. 2021) ................................... 20, 24, 38

*Davis v. Gray*,
83 U.S. (16 Wall.) 203 (1872) ........................................................... 56

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) ............................................................ 18

*Evans v. Cunningham*,
335 F.2d 491 (4th Cir. 1964) .................................................................. 60

*Ex parte Young*,
209 U.S. 123 (1908) ............................................................... passim

*FCC v. League of Women Voters of Cal.*,
468 U.S. 364 (1984) .................................................................. 38

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) ............................................................... 3, 19

*Governor of Ga. v. Madrazo*,
26 U.S. (1 Pet.) 110 (1828) ....................................................... 56

*Green Party of Tenn. v. Hargett*,
791 F.3d 684 (6th Cir. 2015) ....................................................... 53

*Heffron v. Int'l Soc. for Krishna Consciousness*,
452 U.S. 640 (1981) .................................................................... 3

*Hill v. Williams*,
No. 16-cv-02627, 2016 WL 8667798 (D. Colo. Nov. 4, 2016) ......... 23, 30

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .............................................................. 49, 50

*Ind. C.L. Union Found., Inc. v. Ind. Sec'y of State*,
229 F. Supp. 3d 817 (S.D. Ind. 2017)................................ 20, 24, 30, 38

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) ............................................................... passim

*Kendall v. Balcerzak*,
650 F.3d 515 (4th Cir. 2011) ....................................................... 25

*Krasno v. Mnookin*,
148 F.4th 465 (7th Cir. 2025)...................................................... 42

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .................................................................. 58

*McCullen v. Coakley*,
573 U.S. 464 (2014) .................................................................. 32

*McGuire v. Marshall*,
50 F.4th 986 (11th Cir. 2022)...................................................... 53

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .......... 25

*McLaughlin v. N.C. Bd. of Elections*,
65 F.3d 1215 (4th Cir. 1995) .......... 25

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) .......... passim

*Multimedia Publ'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*,
991 F.2d 154 (4th Cir. 1993) .......... passim

*Navigators Ins. Co. v. Under Armour, Inc.*,
165 F.4th 171 (4th Cir. 2026) .......... 18

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
597 F.3d 570 (4th Cir. 2010) .......... passim

*Olivier v. City of Brandon*,
146 S. Ct. 916 (2026) .......... 50

*Osborn v. Bank of the U.S.*,
22 U.S. (9 Wheat.) 738 (1824) .......... 56

*OUTMemphis v. Lee*,
No. 2:23-CV-2670, 2026 WL 881226 (W.D. Tenn. Mar. 31, 2026) .......... 57

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) .......... 40, 46

*PETA v. N.C. Farm Bureau Fed'n, Inc.*,
60 F.4th 815 (4th Cir. 2023) .......... 20, 21

*Pierce v. Soc'y of Sisters*,
268 U.S. 510 (1925) .......... 56

*Police Dep't of Chi. v. Mosley*,
408 U.S. 92 (1972) .......... 23

*Project Veritas Action Fund v. Rollins*,
982 F.3d 813 (1st Cir. 2020) .......... 53

*Reagan v. Farmers' Loan & Tr. Co.*,
154 U.S. 362 (1894) .......... 56

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... passim

*Regan v. Time, Inc.*,
468 U.S. 641 (1984) .......... 23

*Rideout v. Gardner*,
123 F. Supp. 3d 218 (D.N.H. 2015) .......... 20, 22, 24

*Rideout v. Gardner*,
838 F.3d 65 (1st Cir. 2016) .......... passim

*Rogers v. Madison Cnty. Clerk*,
No. 2016-SC-3147, 2017 WL 3475008
(Ill. Cir. Ct. July 20, 2017) .......... 31, 38

*Royal Canin U.S.A., Inc. v. Wullschleger*,
604 U.S. 22 (2025) .......... 51

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989) .......... 35

*Schneider v. New Jersey*,
308 U.S. 147 (1939) .......... 35

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) .......... 47

*Silberberg v. Bd. of Elections*,
272 F. Supp. 3d 454 (S.D.N.Y. 2017) .......... 20, 24

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... passim

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) .......... passim

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997) .......... 28

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) .......... 25, 32, 33, 35

*United States v. Sup. Ct. of N.M.*,
839 F.3d 888 (10th Cir. 2016) .......... 53

*Village of Schaumburg v. Citizens for a Better Env't*,
444 U.S. 620 (1980) .......... 35

*Wash. Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) .......... 15, 20, 25, 26

*Welty v. Dunaway*,
791 F. Supp. 3d 818 (M.D. Tenn. 2025) .......... 57

*White Coat Waste Project v. Greater Richmond Transit Co.*,
35 F.4th 179 (4th Cir. 2022) .......... 39, 43, 44, 46

*Wisconsin v. Buzzell*,
No. 2022-cv-000361 (Wis. Cir. Ct. Nov. 27, 2023) .......... 31

**Statutes**

18 U.S.C. § 597 .......... 34

28 U.S.C.
§ 1291 .......... 4
§ 1331 .......... 4
§ 1343 .......... 4

52 U.S.C. § 10307(b) .......... 34

Ala. Code § 17-9-50.1 (2019) .......... 31

Ariz. Rev. Stat. § 16-1018(4) (2018) .......... 31

Cal. Elec. Code § 14291 (2017) .......... 31

Colo. Rev. Stat. § 1-13-712 (2022) .......... 31

Haw. Rev. Stat. § 11-121 (2016) .......... 31

Iowa Code § 49.88 (2021) .......... 31

N.C. Gen. Stat.
§ 163-165.1 .......... 6, 37
§ 163-166.2 .......... 34
§ 163-166.3 .......... 6, 7, 39, 41
§ 163-273 .......... 6, 34, 36
§ 163-274 .......... 6, 34, 37
§ 163-275 .......... 34
§ 163-48 .......... 34, 41

N.M. Stat. § 1-12-59 (2019) .......... 31

Neb. Rev. Stat. § 32-1527 (2016) .......... 31

Okla. Stat. tit. 26 § 7-109 (2019) .......... 31

Utah Code § 20A-3a-504 (2020) .......... 31

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 18

Fed. R. Civ. P. 12(c) .......... 18, 54

**Other Authorities**

Fed. Election Comm'n, *Federal Elections 2020: Election Results for the U.S. President, the U.S. Senate and the U.S. House of Representatives* (2022) .......... 32

*Public Data*, N.C. State Bd. of Elections .......... 7, 29

# INTRODUCTION

No matter where you vote or for whom you vote, participating in our democracy is something in which voters should take pride. Plaintiff-Appellant Susan Hogarth does. So she takes pictures of her voted ballots and posts them on social media—partly to promote her candidates; partly to model and advocate voting, and doing so for third-party candidates; and partly to object to North Carolina laws that prohibit her taking and posting the pictures at all. For that, the state sent Hogarth a letter threatening prosecution.

That's because North Carolina criminalizes celebrating voting with "ballot selfies" that uniquely express for whom and/or what you actually voted, even though they are core political speech entitled to the First Amendment's "fullest and most urgent application." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (citation omitted). Despite that apex protection, the Defendant-Appellees offered—even with extensive briefing below—nothing more to justify banning ballot selfies than to "simply posit the existence" of a few "abstract" government interests, which cannot carry their constitutional

burden for restricting speech. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).

As the First Circuit explained in invalidating a New Hampshire law similar to those in North Carolina, a ballot selfie ban that "reaches and prohibits innocent political speech by voters" but is "unconnected to" the government's proffered interests cannot withstand First Amendment scrutiny. *Rideout v. Gardner*, 838 F.3d 65, 75 (1st Cir. 2016). Like New Hampshire's ill-fated law, the statutory provisions comprising North Carolina's ballot selfie ban "suppress a large swath of political speech" without constitutionally sufficient justification. *Id.*

Four provisions ban and criminalize taking and sharing photos of voted ballots anywhere (the "Ballot Photography Provisions"). Singling out particular speech for disfavored treatment in this way is content discrimination that is "presumptively unconstitutional," *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), and subject to strict scrutiny's "demanding standard," *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026). A fifth provision grants elections officials unbridled discretion to stop voters from photographing themselves in polling places (the "Voting Enclosure Provision"). That kind of "arbitrary discretion" is an

unreasonable and thus unconstitutional burden on speech in a nonpublic forum. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 21 (2018) (quoting *Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640, 649 (1981)).

All five provisions (collectively, the "Ballot Selfie Ban") censor speech at "the heart of the First Amendment's protection," *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776–77 (1978), and Defendants failed to constitutionally justify below, under any applicable standard, restricting North Carolinians' First Amendment rights in this manner.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this First Amendment lawsuit under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction). This Court has appellate jurisdiction under 28 U.S.C. § 1291 (final decisions). The district court entered its final order and judgment on the parties' cross-motions for judgment on the pleadings on March 9, 2026, JA001–017, and Hogarth filed a notice of appeal on March 20, 2026, JA297–298. On April 7, 2026, this Court set an accelerated briefing schedule for this appeal. 4th Cir. Dkt. No. 21.

## STATEMENT OF ISSUES

1. Whether Hogarth is entitled to judgment on the pleadings that North Carolina's Ballot Selfie Ban violates the First Amendment where the state offers only abstract interests in censoring photos of voted ballots, other state voting laws less restrictively address its concerns, and the Ban gives officials unbridled discretion over who may photograph themselves in voting enclosures.

2. Whether the district court improperly analyzed North Carolina's Ballot Selfie Ban only as applied to Hogarth's past selfies taken inside voting enclosures while ignoring both her well-pleaded intent to take and share ballot selfies everywhere—including when voting absentee—as well as her facial challenge to the Ban as applied to all such locations.

3. Whether this Court can direct entry of judgment for Hogarth where the question is wholly legal, the legal arguments are fully presented, and the Ballot Selfie Ban violates the First Amendment.

## STATEMENT OF CASE

### A. North Carolina law bans ballot selfies.

Five provisions of North Carolina law ban different aspects of taking and sharing ballot selfies. The first four—the Ballot Photography Provisions—apply everywhere and ban taking or sharing photographs of a voted ballot, with no exception for voters photographing their own ballot. JA042 (¶¶ 42–43), JA152. First, section 163-166.3(c) of the General Statutes of North Carolina prohibits photographing any voted ballot (in person or absentee). Second, section 163-273(a)(1) makes it a misdemeanor for a voter to show their own voted ballot to anyone else, including through photographic copies. Third and fourth, sections 163-165.1(e) and 163-274(b)(1) make it a misdemeanor for anyone to disclose how they voted if they have access to an electronic record of their own voted ballot, with no exceptions for digital photographs.

A fifth statutory provision, the Voting Enclosure Provision, applies only in the voting enclosure—the room at the polling place where voting occurs—and requires voters to obtain permission from a county elections official before photographing any voter, including themselves. N.C. Gen. Stat. § 163-166.3(b). It does not limit the reasons for which an elections

official may grant or deny voters permission to take a photograph. *See id.* At the same time, it exempts photos of a candidate, which require only the candidate's permission. *See id.*

The North Carolina State Board of Elections investigates reports of violations of the Ballot Selfie Ban. JA035–036, JA048–049, JA157. The State Board's public investigations data from 2015 to 2022 contains no alleged instances of voter fraud involving ballot selfies, despite cataloging nearly 50 reports of voters photographing voted ballots and over 600 referrals for prosecutions of other elections crimes like double voting, felon voting, and voter impersonation. JA048.[1] Nor did Defendants offer evidence in the district court of ballot selfies contributing to vote buying or any other harm in North Carolina (or anywhere else).

### B. Susan Hogarth takes ballot selfies to share her political beliefs.

Susan Hogarth resides and votes in Wake County, North Carolina. JA035. In March 2024, she went to her polling place, voted, and took a

---

[1] *See also Public Data*, N.C. State Bd. of Elections, https://dl.ncsbe.gov/?prefix=Investigations [https://perma.cc/E37UD8CL] (last visited April 29, 2026). The "Investigations" page of the State Board website contains download links to documents detailing the history of State Board referrals and investigations.

ballot selfie. JA043–044. From the time she arrived until she left, no more than three other voters entered the voting enclosure. JA043. Hogarth then exited the polling place and posted her ballot selfie to X (formerly known as Twitter). JA044–045.




Hogarth posted the photo for several reasons: to promote her favored candidates, to spread awareness that voters can and do vote for third-party candidates, and to encourage others to vote. The photo also expresses her enthusiasm for participating in the electoral process and gives voice to her disagreement with the Ballot Selfie Ban. JA053.

Two weeks later, Hogarth received a letter from the State Board threatening criminal prosecution. JA046, JA068. In the letter, State

Board Investigator Danielle Brinton informed Hogarth she was pursuing Hogarth's ballot selfie as a "violation[] of election laws" and warned four times that ballot selfies are illegal in North Carolina. JA046–047, JA068. Investigator Brinton threatened Hogarth with a "Class 1 Misdemeanor" and demanded she "take the post down." JA046–047, JA068.

Hogarth's March 2024 ballot selfie post remains public, and she does not intend to take it down. JA049. This was not Hogarth's first time taking and sharing a ballot selfie, nor her last. JA043, JA050, JA070–071. Hogarth intends to vote in future elections, either in person or absentee, and to take and share ballot selfies when she does. JA050.

### C. Hogarth challenges North Carolina's Ballot Selfie Ban.

In August 2024, Hogarth filed this lawsuit challenging the Ballot Selfie Ban as it applies to voters photographing their own voted ballots and/or themselves in the voting enclosure.[2] Hogarth's Verified Complaint sought declaratory and injunctive relief against officials from the State

---

[2] Hogarth's claims thus comprise the type of "facial as-applied" challenge described by the Supreme Court in *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010), in that they challenge a subset of a statute's applications rather than the entire statute (a "facial" challenge) or, put differently, solely the statute's application against a particular category of activity. *See infra* Part II.B.1.

Board and the Wake County Board of Elections, the Wake County District Attorney, and the North Carolina Attorney General. JA035–038, JA051–053. Her first claim challenged the Ballot Photography Provisions on their face as they apply to ballot selfies to enjoin Defendants from preventing her from—or prosecuting her for—taking or sharing future ballot selfies, either in the voting enclosure (in-person voting) or elsewhere (absentee voting). JA053–058. Her second claim challenged the Voting Enclosure Provision, also on its face as applied to ballot selfies, to enjoin Defendants from preventing her from taking or sharing future ballot selfies when she votes in person. JA058–061.[3]

In conjunction with her claims, Hogarth filed a Motion for Preliminary Injunction to protect herself from enforcement of the Ballot Selfie Ban during pendency of the action. JA022. Defendants opposed the preliminary injunction motion, JA024, but after Wake County District Attorney Freeman agreed to a limited injunction, the district court

[3] Hogarth's third claim sought relief from the Ballot Photography Provisions as applied, retrospectively, to her March 2024 ballot selfie, to prevent the State Defendants and District Attorney Freeman from criminally prosecuting her as threatened in the State Board's letter. JA061–063.

entered an order granting Hogarth's motion in part on October 21, 2024. JA026. Four days later, the court clarified that its order allowed Hogarth "to take and share her ballot 'selfie' without fear of prosecution" by District Attorney Freeman. JA026.

On October 26, 2024, the day after the Court clarified its preliminary injunction order, Hogarth attended an early voting polling place and photographed herself with her completed ballot in the voting booth. JA070–071. As Hogarth detailed in her Verified Supplemental Complaint, when she took her ballot selfie, a county elections official yelled to Hogarth from across the room, "you cannot take a picture of your ballot, you need to delete that, please." JA071. Only after Hogarth told the elections official about the district court's injunction and the chief judge of the polling place received permission from "the Board of Elections" did the official allow Hogarth to submit her ballot and leave without deleting the photo. JA071–072.

In March 2025, the district court denied Defendants' motions to dismiss for lack of standing, except for that of the North Carolina Attorney General, who is thus no longer a party. JA027. By agreement, the remaining parties filed Rule 12(c) cross-motions for judgment on the

pleadings. JA028–029. The district court granted Defendants' motion, denied Hogarth's, and entered judgment for Defendants. JA001–017.

The district court analyzed the Ballot Selfie Ban's application only to polling places, even though its Ballot Photography Provisions ban taking and sharing ballot selfies everywhere, including absentee ballots at home. JA010–011. The court, therefore, instead of noting their content-based operation and applying strict scrutiny, assessed the provisions only under the requirement that speech regulations in nonpublic forums be reasonable means of securing polling places for their intended purpose. JA011–015 And rather than enforcing either *Mansky*'s requirement that regulations of speech in nonpublic forums cannot grant officials unbridled discretion to censor or this Court's requirement that the government must support its justifications for burdening speech with evidence, the district court held the Ballot Selfie Ban survived based solely on "common sense." JA013–014.

Hogarth promptly appealed because she intends to vote in the upcoming November 2026 election and to take and share a ballot selfie when she does. JA050. To give this Court the opportunity to rule before

Election Day, Hogarth moved for an accelerated briefing schedule, which this Court entered on April 7, 2026. 4th Cir. Dkt. No. 21.

## SUMMARY OF ARGUMENT

North Carolina's Ballot Selfie Ban discriminates against voters' protected political expression based on the content they express. Because the Ballot Photography Provisions apply everywhere, they are subject to strict scrutiny, a "demanding standard" under which "it is rare that a regulation ... will ever be permissible." *Chiles*, 146 S. Ct. at 1021 (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011)). The Voting Enclosure Provisions, which apply only at polling places, must still provide "some sensible basis for distinguishing what [speech] may come in from what must stay out." *Mansky*, 585 U.S. at 16.

The Ballot Photography Provisions cannot withstand strict scrutiny because Defendants cannot show their "recited harms" justifying it "are real, not merely conjectural," *Turner Broad. Sys.*, 512 U.S. at 662, 664, or that the provisions are narrowly tailored to avoid unduly burdening speech. Asserted interests in preventing vote buying, social coercion, voting delays, distraction, voter intimidation, and violation of other voters' privacy fall flat, because Defendants fail to "meaningfully demonstrate" that banning ballot selfies as a means of furthering those interests is "impelled by the facts on the ground." *Wash. Post v. McManus*, 944 F.3d 506,

521 (4th Cir. 2019). Nor can Defendants meet their burden of narrow tailoring, chiefly because North Carolina has statutes *directly* addressing those asserted interests without targeting speech. *Cf. Rideout*, 838 F.3d at 74 (holding New Hampshire failed to prove "other state and federal laws prohibiting vote corruption are not already adequate to the justifications it has identified").

Meanwhile, the Voting Enclosure Provision gives elections officials unbounded authority to arbitrarily grant or refuse voters permission to photograph themselves in the polling place, which is not "reasonable in light of the purpose served by the forum." *Mansky*, 585 U.S. at 13, 23. Government officials wielding "arbitrary discretion" to censor speech is anathema to the First Amendment. *Id.* at 21. What is more, all provisions of the Ballot Selfie Ban fail this Circuit's reasonableness test for nonpublic forums, because Defendants have not demonstrated that their purported need to prohibit polling place ballot selfies outweighs the impairment of core political speech. *See News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 581 (4th Cir. 2010) (striking down ban on airport newspaper racks because the government offered insufficient evidence to justify a "significant restriction" on expression).

Yet, although the Ballot Selfie Ban violates the First Amendment for all these reasons, the district court denied Hogarth judgment on the pleadings, and granted it to Defendants, because it misconstrued her challenge in two ways. First, it limited Hogarth's as-applied claim to two specific instances when Defendants tried to stop her from taking and sharing ballot selfies from the polling place. This ignored all future contexts in which the Ballot Selfie Ban restricts her speech, including her well-pleaded intention to take and share ballot selfies everywhere, including when she votes absentee. Second, the district court improperly discarded Hogarth's facial claims which, as in *John Doe No. 1*, 561 U.S. 186, seek to enjoin the Ban on its face to the extent it applies to all ballot selfies. By examining only Defendants' prior enforcement against Hogarth, the district court ignored Hogarth's entitlement to an injunction against the Ballot Selfie Ban's future enforcement under *Ex parte Young*, 209 U.S. 123 (1908).

All of the provisions of the Ballot Selfie Ban, everywhere they apply, fail the First Amendment's demanding tests for restrictions on political speech. This Court should follow the First Circuit in *Rideout* and

invalidate North Carolina's Ballot Selfie Ban by ordering the entry of judgment in Hogarth's favor on all her claims.

## ARGUMENT

The district court improperly granted Defendants judgment on the pleadings because North Carolina's Ballot Selfie Ban criminalizes core political speech and Defendants' justifications cannot satisfy any level of First Amendment scrutiny. This Court reviews that decision *de novo* under the Rule 12(b)(6)/12(c) standard. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). And accepting "the facts alleged by the non-moving party as true and drawing all reasonable factual inferences in favor of the non-moving party" on the cross-motions, *Navigators Ins. Co. v. Under Armour, Inc.*, 165 F.4th 171, 180 n.9 (4th Cir. 2026), Hogarth is entitled to judgment on the pleadings.

As explained in Part I below, North Carolina's Ballot Selfie Ban violates the First Amendment. Its Ballot Photography Provisions fail strict scrutiny because Defendants cannot demonstrate that banning photos of voters' own ballots serves a compelling government interest or is the least restrictive means of doing so. The Voting Enclosure Provision is also unconstitutional, because giving officials unbridled discretion to censor voters' photos of themselves is not a reasonable restriction on speech in the polling place.

This Court should also order the entry of judgment for Hogarth on her claims because, as explained in Part II, the district court improperly reviewed the Ballot Selfie Ban only as it applies to polling places. In doing so, it ignored Hogarth's well-pleaded facial and as-applied challenges to the Ban's future enforcement against ballot selfies taken or shared away from the voting enclosure, including absentee ballots. And as explained in Part III, this Court may enter judgment in Hogarth's favor in these regards because this appeal involves purely legal arguments that have been fully presented below and will be on appeal as well.

## I. North Carolina's Ballot Selfie Ban violates the First Amendment by unjustifiably censoring core political speech.

The First Amendment protects ballot selfies from state censorship because taking and sharing photos to uniquely express how one voted is protected political speech. Expression about elections and referenda "is the type of speech indispensable to decisionmaking in a democracy," speech that lies at "the heart of the First Amendment's protection." *First Nat'l Bank*, 435 U.S. at 776–77. "Because our democracy relies on free debate as the vehicle of dispute and the engine of electoral change, political speech occupies a distinctive place in First Amendment law."

*McManus*, 944 F.3d at 513–14. That is why every court to consider a challenge to a ballot selfie ban has agreed the photos constitute protected speech. *See Rideout*, 838 F.3d at 75.[4]

And the First Amendment's protection of free speech safeguards the "creation of information," *e.g.*, taking a ballot selfie, just "as much … as its dissemination," *e.g.*, sharing a ballot selfie. *PETA v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir. 2023) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011)). For example, in *PETA*, this Court invalidated a law that criminalized taking undercover slaughterhouse videos to expose animal cruelty because "the right to publish a recording

---

[4] *See also Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370, 1386 & n.11 (N.D. Ga. 2021) (noting the "right to photograph or videotape is protected by the First Amendment" and holding a ballot selfie ban that "prohibits any photography or recording of any voted ballot in public and nonpublic forums alike" violates the First Amendment); *Silberberg v. Bd. of Elections*, 272 F. Supp. 3d 454, 475 (S.D.N.Y. 2017) (explaining that New York's ballot selfie ban "prohibit[s] individuals from using the medium of a marked ballot for expressive conduct"); *Ind. C.L. Union Found., Inc. v. Ind. Sec'y of State*, 229 F. Supp. 3d 817, 828 (S.D. Ind. 2017) (holding Indiana's ballot selfie ban "embodies a content-based restriction on speech that cannot survive strict or intermediate scrutiny"); *Rideout v. Gardner*, 123 F. Supp. 3d 218, 230 (D.N.H. 2015) (noting that New Hampshire's ban "deprive[d] voters of one of their most powerful means of letting the world know how they voted"), *aff'd*, 838 F.3d 65.

would be largely ineffective, if the antecedent act of *making* the recording is wholly unprotected." *Id*. at 829, 841 (citation omitted).

As the First Circuit explained in *Rideout*, ballot selfies have "special communicative value," allowing voters to "express support for a candidate and communicate that the voter has in fact given his or her vote to that candidate." 838 F.3d at 75. Ballot selfies, therefore, embody the well-known aphorism "a picture is worth a thousand words." *Id*. at 76. And the Ballot Selfie Ban unconstitutionally silences that speech.

### A. The Ballot Photography Provisions fail strict scrutiny because they are content based but not narrowly tailored to serve a compelling state interest.

#### 1. The Ballot Photography Provisions trigger strict scrutiny as content-based regulations of speech.

The Ballot Photography Provisions are content-based regulations subject to strict scrutiny because they single out a particular type of expression—photos of completed ballots—for disfavored treatment. *See Reed*, 576 U.S. at 163 (holding "regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed").

As an initial matter, contrary to the district court's erroneously narrow review, JA010–011, the Court must evaluate the Ballot Photography

Provisions under standard First Amendment scrutiny—not merely nonpublic forum analysis applicable solely to government property—because they apply *everywhere* in North Carolina, not just official polling places. *See Rideout*, 123 F. Supp. 3d at 230–31. *But cf. infra* Part I.C (confining analysis of Voting Enclosure Provision to nonpublic forum standard because it applies only in voting enclosures). The State Board admitted the Ballot Photography Provisions prohibit voters from taking or sharing photos of completed ballots anywhere, anytime—whether they voted in person or absentee. JA042 (¶ 42), JA048 (¶¶ 93, 94), JA152 (¶ 42), JA157 (¶¶ 93, 94). North Carolinians thus violate the Ballot Photography Provisions when they post a ballot selfie to social media from the car, text a selfie of an absentee ballot to their mom from the kitchen table, or just show their ballot selfie to a friend in the park.

Applying standard First Amendment tests, the Ballot Photography Provisions are content-based speech restrictions subject to strict scrutiny because their application depends "entirely on the communicative content" of the images they regulate: photos of voted ballots. *Reed*, 576 U.S. at 164. In *Reed*, the Supreme Court addressed an ordinance setting maximum sizes for outdoor signs depending on whether the signs directed

people to events, advertised political campaigns, or conveyed "ideological" messages. *Id.* at 159–61. The Court explained that because enforcing the ordinance required differentiating based on what the signs contained, the ordinance was content based and subject to strict scrutiny. *Id.* at 164; *see also Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) (holding picketing ordinance content based because the "operative distinction is the message on a picket sign"); *Regan v. Time, Inc.*, 468 U.S. 641, 648 (1984) (holding statute regulating photos of U.S. currency content based). Here, criminalizing images of voted ballots but not, for example, unvoted ballots—or, to use the district court's example, images of a pen pointing at a candidate on an unvoted ballot, Prelim. Inj. Mot. Hr'g Tr. 29:21–30:9, E.D.N.C. Dkt. No. 52—discriminates between photos based on content.

Every court that has examined ballot selfie bans has held they are content based.[5] The Southern District of Indiana held that the state's ballot selfie ban was content based because "[a] voter remains free … to take

---

[5] Because the First Circuit and the District of Colorado both determined the ballot selfie laws they reviewed would have failed *intermediate* scrutiny, they bypassed ruling on whether the laws were content based. *Rideout*, 838 F.3d at 72; *Hill v. Williams*, No. 16-cv-02627, 2016 WL 8667798, at *9 (D. Colo. Nov. 4, 2016).

photographs of anything and everything other than her ballot" and "[n]ot until after her photographs are examined as to their content will the government know whether" they are illegal. *Ind. C.L. Union Found.*, 229 F. Supp. 3d at 823 (invalidating ballot selfie ban). The District of New Hampshire, for the same reason, held that a ballot selfie ban was content based because it restricted only "images of marked ballots" while, as here, "[i]mages of unmarked ballots … may be shared … without restriction." *Rideout*, 123 F. Supp. 3d at 229, *aff'd*, 838 F.3d 65; *see also Coal. for Good Governance*, 558 F. Supp. 3d at 1386 (holding en route to invalidating Georgia's ballot selfie restrictions that they were content based because they "regulate what type of ballot information a person may record").[6]

As content-discriminatory laws, the Ballot Photography Provisions are subject to strict scrutiny's "demanding standard." *Chiles*, 146 S. Ct. at 1021. And that standard, as this Court has noted, is "in

---

[6] Even in upholding New York's ballot selfie ban, the Southern District of New York held the law was content based because it "applies to particular speech because of the topic discussed or the idea or message expressed." *Silberberg*, 272 F. Supp. 3d at 474. The law ultimately became a rare instance of surviving strict scrutiny only because of the state's unique history of vote buying and voter intimidation, which is absent in this case. *See infra* Part I.B.2.

practice … virtually impossible to satisfy." *McManus*, 944 F.3d at 520.[7] That observation is borne out with North Carolina's Ballot Photography Provisions, as shown next.

**2. The Ballot Photography Provisions fail strict scrutiny.**

Defendants cannot sustain the content-based Ballot Photography Provisions because they are not "narrowly tailored to serve [a] compelling state interest" as applied to ballot selfies. *Reed*, 576 U.S. at 163. Defendants have not shown their asserted interests arise from "reasonable inferences based on substantial evidence." *Turner Broad. Sys.*, 512 U.S. at 664–66. Nor are the provisions the least restrictive means of pursuing Defendants' asserted interests, the tailoring strict scrutiny requires. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 827 (2000).

---

[7] Defendants urged the district court to evaluate the Ballot Photography Provisions under the *Anderson-Burdick* test, JA183–188, but that standard applies only to "mechanics of the electoral process" like filing deadlines, voter eligibility, ballot access, or the ability to vote by mail. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–46 (1995). It does not apply to speech regulations that, like the Ballot Photography Provisions, directly regulate "pure" speech, *id.*, or are content based, *Kendall v. Balcerzak*, 650 F.3d 515, 525 (4th Cir. 2011).

**a. North Carolina lacks a compelling interest in banning voters from photographing their own ballots.**

The Ballot Photography Provisions fail the first prong of strict scrutiny as applied to ballot selfies because Defendants merely assert, but do not substantiate, the government's interests in banning them. *Reed*, 576 U.S. at 163. To sustain a speech restrictive law, the government must show its asserted interests arise from "reasonable inferences based on substantial evidence." *Turner Broad. Sys.*, 512 U.S. at 664–66. As this Court explained, that means the government must "meaningfully demonstrate" that speech-restrictive regulations are "impelled by the facts on the ground." *McManus*, 944 F.3d at 521. At minimum, Defendants must show the harms they identify actually exist. *Id*.

But here, although Defendants argued the Ballot Photography Provisions prevent "vote buying," "social coercion," "delays," "distraction," "voter intimidation," and the violation of other voters' "privacy," JA172, JA179, JA185–187, they did not show any of these asserted harms have occurred in North Carolina, let alone in connection with ballot selfies.

When, as here, a state fails to demonstrate its "recited harms are real, not merely conjectural," its speech restriction must fall. *Turner*

*Broad. Sys.*, 512 U.S. at 662, 664. In short, Defendants failed to show ballot selfies actually cause the harms they assert.

*Turner* is on point. There, the Supreme Court addressed a regulation forcing cable television providers to carry local broadcast stations. The Court held that, even though the FCC's asserted interest in preventing local stations from closing was "important in the abstract," the government needed to do more than "simply posit the existence of the disease sought to be cured." *Id.* at 664–66. The Court explained that, even assuming cable operators would drop local stations absent a must-carry rule, the government's failure to demonstrate that that would cause local stations "genuine" economic harm would mean the rule could not survive even intermediate scrutiny. *Id.*[8]

[8] The more forgiving intermediate scrutiny applicable to content-neutral regulations still requires they serve an "important" governmental interest. *Turner Broad. Sys.*, 512 U.S. at 662. And it still requires evidence of "real" rather than conjectural harms. *Id.* at 664. The Defendants' wholesale failure to show that is the case with its interests underlying the Ballot Photography Provisions mean they flunk intermediate as well as strict scrutiny. *See Rideout*, 838 F.3d at 72 (declining to resolve whether ballot selfie ban was subject to strict scrutiny because the ban failed even intermediate scrutiny which requires demonstrating a linkage between the asserted interests and the remedial impact of the law). Conversely, after initially failing to meet this burden in *Turner*, 512 U.S. at 667, the federal government ultimately prevailed by providing

Defendants defended the Ballot Selfie Ban below by asserting it prevents vote buying but supplied no evidence of the required "direct causal link" to ballot selfies. *Brown*, 564 U.S. at 799. Defendants in fact could not supply evidence of a single vote-buying prosecution in North Carolina, much less one involving ballot selfies. That puts this case on par with *Brown*, where the Supreme Court held California's age-based video game restrictions failed the first prong of strict scrutiny because, among other reasons, the government failed to offer evidence of a "direct causal link between violent video games and harm to minors." *Id.* at 786, 799–800.

The district court held "the very absence" of unlawful schemes involving ballot selfies is evidence the Ballot Selfie Ban deters voters from using ballot selfies to facilitate vote buying. JA014. But that circular logic would enable every law to be sustained by its own existence. And more importantly from a constitutional perspective, it is insufficient to satisfy *Turner*'s requirement that, even where "complete empirical support may

---

extensive records detailing the evidence before Congress pre-enactment. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195–97 (1997).

be unavailable," the state must still show its interests arise from "reasonable inferences based on substantial evidence." 512 U.S. at 665–66.

Here, conversely, the State Board's records contain plentiful evidence that the Ballot Photography Provisions are not stopping voters from taking ballot selfies, yet there is a dearth of evidence connecting ballot selfies to vote buying or any other harm. *Public Data*, *supra* note 1. Defendants' interest in preventing ballot-selfie-based vote buying is thus "merely conjectural," such that Defendants fail to meet their burden to justify restricting political speech. *Turner Broad. Sys.*, 512 U.S. at 664.

Defendants' other proffered harms—social coercion, delays, distraction, voter intimidation, and violating other voters' privacy—are likewise unconnected to evidence demonstrating these problems exist or that banning ballot selfies alleviates them. JA172, JA179, JA185–187. For example, Defendants attempted to support their interest in fighting "coercion" by arguing voters "may" face pressure to show others they voted a certain way, JA181, but that "may" epitomizes "merely conjectural" guesswork, *Turner Broad. Sys.*, 512 U.S. at 664.

Federal courts have thus repeatedly struck down ballot selfie bans because of states' failure to establish compelling interests, or even

important ones. In *Rideout*, the First Circuit explained that even though "[d]igital photography, the internet, and social media" had been "ubiquitous for several election cycles," New Hampshire's failure to show ballot selfies had "the effect of furthering vote buying or voter intimidation" doomed its ban under either strict or intermediate scrutiny. 838 F.3d at 73. The Southern District of Indiana likewise noted that even though "a large percentage of Americans own and use smartphones to take and share digital images," the state failed "to produce a single instance of [ballot selfies] having been used to facilitate vote buying or voter coercion." *Ind. C.L. Union Found.*, 229 F. Supp. 3d at 825. And in *Hill*, the District of Colorado enjoined the state's ballot selfie ban in part because Colorado's expert witness conceded "vote buying and voter intimidation largely disappeared during the twentieth century and there is currently no record of extensive vote buying." 2016 WL 8667798, at *10.

North Carolina likewise comes to the Court empty-handed. Between *Rideout* in 2016 and the 2020 general election, the number of states in which ballot selfies are legal nearly doubled, to thirty-one.[9] In

[9] For the 2020 election, ballot selfies were legal in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland,

that time, fifteen states either passed laws permitting ballot selfies[10] or had their bans struck down in court,[11] leading to tens of millions of ballots cast in states with legalized ballot selfies.[12] Yet Defendants fail to produce a single example—from *any* state—of a ballot selfie used for vote buying or connected to any of their other asserted harms. That failure is fatal under the First Amendment. *See Brown*, 564 U.S. at 799.

---

Michigan, Nebraska, New Hampshire, New Mexico, North Dakota, Oklahoma, Oregon, Rhode Island, Utah, Vermont, Virginia, Washington, Wisconsin, and Wyoming.

[10] *See* Ala. Code § 17-9-50.1 (2019); Ariz. Rev. Stat. § 16-1018(4) (2018); Cal. Elec. Code § 14291 (2017); Colo. Rev. Stat. § 1-13-712 (2022); Haw. Rev. Stat. § 11-121 (2016); Iowa Code § 49.88 (2021); Neb. Rev. Stat. § 32-1527 (2016); N.M. Stat. § 1-12-59 (2019); Okla. Stat. tit. 26 § 7-109 (2019); Utah Code § 20A-3a-504 (2020).

[11] *See supra* note 4; *see also Rogers v. Madison Cnty. Clerk*, No. 2016-SC-3147, 2017 WL 3475008, at *2 (Ill. Cir. Ct. July 20, 2017) (striking down an Illinois ballot selfie law); *Wisconsin v. Buzzell,* No. 2022-cv-000361 (Wis. Cir. Ct. Nov. 27, 2023) (dismissing criminal charges and declaring that a law prohibiting ballot selfies unconstitutional).

[12] The total number of 2020 voters in the states where ballot selfies were legal was over 80 million. *See* Fed. Election Comm'n, *Federal Elections 2020: Election Results for the U.S. President, the U.S. Senate and the U.S. House of Representatives* 7 (2022), https://www.fec.gov/resources/cms-content/documents/federalelections2020.pdf [https://perma.cc/B28B-ZGSC] (showing how many people voted in each state in the 2020 presidential election).

**b. The Ballot Photography Provisions are not narrowly tailored to achieve Defendant's purported interests.**

Even if Defendants could establish a compelling government interest, the Ballot Photography Provisions fail strict scrutiny as applied to ballot selfies because they are not narrowly tailored to further those interests. The First Amendment does not permit censorship as a "path of least resistance," so narrow tailoring prevents "the government from too readily 'sacrific[ing] speech for efficiency,'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted), by requiring that "[i]f a less restrictive alternative would serve the Government's purpose," the state must use it, *Playboy Ent. Grp.*, 529 U.S. at 813. Defendants have not done so here, as the government can simply use North Carolina's on-the-books statutes addressing the harms they seek to cure without impinging upon speech. The Ballot Photography Provisions further fail narrow tailoring because they are under- and overinclusive, in that they "unnecessarily circumscribe protected expression," while "leaving appreciable damage" to Defendants' asserted interests. *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (cleaned up).

#### i. The Ballot Photography Provisions are not the least restrictive means of achieving the asserted interests.

The Ballot Photography Provisions are not narrowly tailored because Defendants can use less restrictive means to achieve their asserted interests. Like the path the district court should have taken here, the First Circuit explained in striking down New Hampshire's ballot selfie law that the state failed to prove "other state and federal laws prohibiting vote corruption" were inadequate to the justifications identified. *Rideout*, 838 F.3d at 74. Defendants here likewise cannot meet their burden to prove existing statutes or any other "plausible, less restrictive alternative[s] … will be ineffective to achieve" their goals. *Playboy Ent. Grp.*, 529 U.S. at 816.

That is because North Carolina already has statutes at its disposal addressing each of its proffered harms without banning ballot selfies:

- Vote buying or selling is a Class 1 felony in North Carolina, punishable by up to 10 months in prison. N.C. Gen Stat. § 163-275(2). Federal law also punishes buying or selling votes, with up to two years in prison. 18 U.S.C. § 597.

- Coercing or intimidating voters is a Class 2 misdemeanor, N.C. Gen. Stat. § 163-274(a)(7), and chief judges are statutorily required to prevent intimidation at polling places. N.C. Gen. Stat. § 163-48. The federal Voting Rights Act also prohibits intimidating or coercing voters. 52 U.S.C. § 10307(b).

- Delaying an election by remaining in the voting booth longer than allowed, if forewarned, is a Class 2 misdemeanor. N.C. Gen Stat. § 163-273(a)(5).

- Interfering, or attempting to interfere with other voters in the voting enclosure, or when marking their ballots, are Class 2 misdemeanors. N.C. Gen Stat. §§ 163-273(a)(3)–(4).

- Voter privacy in North Carolina is protected by the requirement that elections officials organize voting enclosures to ensure voters can vote in secret. N.C. Gen Stat. § 163-166.2.

Defendants cannot demonstrate that these non-speech-targeting North Carolina statutes—the "normal method of deterring unlawful conduct," *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001)—are insufficient to achieve their purported interests.

The Supreme Court has repeatedly held that criminal laws targeting unlawful conduct are less restrictive alternatives to those that suppress protected expression. In striking down an ordinance banning public handbilling, for example, the Court explained:

> Frauds may be denounced as offenses and punished by law. Trespasses may similarly be forbidden. If it is said that these means are less efficient and convenient than bestowal of power on police authorities to decide what information may be disseminated from house to house, and who may impart the information, the answer is that considerations of this sort do not empower a municipality to abridge freedom of speech[.]

*Schneider v. New Jersey*, 308 U.S. 147, 164 (1939); *see also, e.g.*, *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (invalidating ban on charitable solicitation because the government's "interest in preventing fraud" could be "better served by measures less intrusive," like "penal laws" that punish fraud directly).

The Supreme Court has also repeatedly confirmed that surviving strict scrutiny's least restrictive means requirement is no easy task. In *Playboy Entertainment Group*, the Court held a law requiring cable channels to either limit the broadcast hours or scramble adult content was not narrowly tailored because the government failed to show a plausible alternative—blocking it in individual households upon request—would be ineffective. 529 U.S. at 825–26. Likewise, in *Sable Communications of California, Inc. v. FCC*, the Court invalidated a ban on "dial-a-porn" services because the government failed to prove more-limited screening requirements would be insufficient. 492 U.S. 115, 129 (1989). Notably, in both cases, the Court required the government to use less restrictive alternatives that did not yet exist in law. Here, Defendants can rely on statutes already on their books.

#### ii. The Ballot Photography Provisions are overinclusive and underinclusive.

The Ballot Photography Provisions also fail strict scrutiny's narrow tailoring requirement because they are overinclusive and underinclusive in pursuing Defendants' asserted interests. *Cent. Radio*, 811 F.3d at 633 (holding over- and underinclusiveness "fatal" to narrow tailoring).

First, the Ballot Photography Provisions are overinclusive because they "unnecessarily circumscrib[e] protected expression," *id.*, by banning ballot selfies that do not facilitate vote buying, delay voting, or cause any of the other harms Defendants posit. For example, section 163-273(a)(1) bans sharing a ballot selfie with anyone *in perpetuity*, even long after the election ends, and/or the candidates on that ballot no longer hold or seek office. When enforcing the ban against Hogarth, the State Board demanded she remove a photo from the internet more than a week after the election ended. JA046, JA068. And because they make no exception for ballot selfies, sections 163-165.1(e) and 163-274(b)(1) bar voters from even *telling* anyone how they voted if they have a digital image of their own voted ballot on their phone. These prohibitions sweep far more broadly than necessary to achieve any of Defendants' purported interests.

Second, the Ballot Photography Provisions are underinclusive because they ban ballot selfies in the name of protecting privacy and preventing disruption while "allowing unlimited numbers of other types" of photos "that create the same problem." *Reed*, 576 U.S. at 171–72. Laws are "fatally underinclusive" when they "leave appreciable damage to the government's interest unprohibited," *Cent. Radio*, 811 F.3d at 633 (cleaned up) (holding content-based sign prohibitions failed strict scrutiny's narrow tailoring requirement by allowing other signs equally likely to cause same harms). By permitting voters to "take and share other photographs taken in the voting enclosure, so long as the photographs do not include voted ballots" or other voters without permission, JA188, the Ballot Photography Provisions leave untouched vast swaths of photography even though Defendants insist photos threaten disruption.

Applying these principles, courts have held ballot selfie bans to be insufficiently tailored to survive strict scrutiny. For example, Indiana's ballot selfie ban was not narrowly tailored because it "dr[ew] into its ambit voters who may choose to take photos for entirely legitimate and legally innocuous reasons," and the state provided no evidence that laws targeting only ballot selfies used in vote-buying schemes would be "much

more difficult to enforce." *Ind. C.L. Union Found.*, 229 F. Supp. 3d at 826–27. Likewise, Georgia's ban restricted more speech than necessary—particularly when compared with an Alabama statute that prohibited ballot photography only in the voting booth and made an allowance for photos of a voter's own ballot. *Coal. for Good Governance*, 558 F. Supp.3d at 1386; *see also Rogers*, 2017 WL 3475008, at *2 (invalidating Illinois ballot selfie ban as not narrowly tailored).

The Ballot Photography Provisions' over- and underinclusiveness "undermine[] the likelihood of a genuine [governmental] interest" by laying bare that the regulations "far exceed[] what is necessary" to achieve Defendants' asserted interests. *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 395–96 (1984). This Court, like the First Circuit with New Hampshire's ballot selfie ban, should hold North Carolina's Ballot Photography Provisions violate the First Amendment.

### B. The Ballot Selfie Ban is not a reasonable regulation of nonpublic forum polling places.

#### 1. The Voting Enclosure Provision, which grants officials unbridled discretion to censor, is not reasonable.

The Voting Enclosure Provision violates the First Amendment by giving elections officials in the polling place unbridled, subjective power

to censor ballot selfies. It requires anyone who wants to photograph themselves in the voting enclosure to obtain permission from an elections official who can grant or deny permission for any reason. N.C. Gen. Stat. § 163-166.3(b). Applying only to photos of voters, the Voting Enclosure Provision is, like the Ballot Photography Provisions, a content-based restriction on speech. *See supra* Part I.B.1. But because it applies only in the voting enclosure, the Voting Enclosure Provision, rather than facing strict scrutiny, is subject to the First Amendment standard for nonpublic forums,[13] which requires "reasonable" means of preserving the forum for its intended purposes. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,

---

[13] As to the voting enclosure itself, the parties have characterized it as a "nonpublic forum," within the framework of this Court's recognition of the "considerable confusion" that exists over whether a "nonpublic forum" is synonymous with or distinct from what the Supreme Court has called a "limited public forum." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 196 n.13 (4th Cir. 2022). Whatever the nomenclature, the parties agree expression takes place in the voting enclosure and that any restrictions on speech therein must be viewpoint neutral and reasonable. JA180, JA191–192 (citing *Mansky*, 585 U.S. 1). Should this Court disagree that an order of remand with instructions to grant judgment to Hogarth is appropriate, *see infra* Part III, and that, instead, further proceedings are required, Hogarth reserves the right to argue both that her polling place is a designated public forum and that the Voting Enclosure Provision is a content-based restriction that fails strict scrutiny, *see supra* Part I.A.

460 U.S. 37, 46 (1983). And this Court requires not only that the restrictions be reasonable, but that the government's asserted justifications must outweigh the burden on speech. *News & Observer*, 597 F.3d at 577. The Voting Enclosure Provision fails both tests.

#### a. The Voting Enclosure Provision is incapable of reasoned application under *Mansky*.

The Voting Enclosure Provision fails the Supreme Court's reasonableness test because it gives government officials unbridled discretion to decide what content is permitted in the forum and what is not. *See Mansky*, 585 U.S. at 16, 21. In *Mansky*, which invalidated Minnesota's standardless ban on "political" apparel in polling places, the Supreme Court held that, in nonpublic forums, content-based regulations are "reasonable" only if they use an "objective, workable standard" that provides "some sensible basis for distinguishing what [speech] may come in from what must stay out" of the forum. *Id.* In that case, the state's ban on voters wearing apparel elections officials deemed "political" in polling places, the Court explained, imbued them with unconstitutionally subjective, "arbitrary discretion" and was thus not "capable of reasoned application." *Id.* at 21, 23.

North Carolina's Voting Enclosure Provision here likewise grants election officials total discretion to grant or deny voters permission to photograph themselves. Nothing in the provision's language—or any other North Carolina law—provides any standards to guide or otherwise limit elections officials' authority. The district court correctly noted that elections officials are instructed to regulate conduct in the polling place to "maintain 'peace and good order,' to prevent attempts to 'obstruct, intimidate, or interfere' with voters, and to prevent 'riots, violence, tumult, or disorder.'" JA014–015 (quoting N.C. Gen. Stat. § 163-48). But the Voting Enclosure Provision does not limit elections officials' approval power to only those reasons. N.C. Gen. Stat. § 163-166.3(b). Thus, it provides officials with discretion to grant or deny permission for any reason, or no reason at all, the very definition of arbitrary discretion and precisely what *Mansky* prohibits. 585 U.S. at 22 (warning of "unfair or inconsistent enforcement" of speech bans).

This Court should follow the Seventh Circuit's decision last year applying *Mansky* to hold unconstitutional a University of Wisconsin-Madison policy prohibiting "off-topic" comments on its social media accounts. That court explained that, just like "political," "off-topic" gave

officials "sheer discretion to censor speech without 'objective, workable standards.'" *Krasno v. Mnookin*, 148 F.4th 465, 485–86 (7th Cir. 2025) (quoting *Mansky*, 585 U.S. at 21). Here, North Carolina's law lacks even a vague limitation like "off-topic" or "political." Instead, the Voting Enclosure Provision grants elections officials "sheer discretion" without "objective, workable standards," *id.*, to decide who can take a ballot selfie, creating a significant risk of "unfair or inconsistent enforcement," *Mansky*, 585 U.S. at 21–22.

The district court tried to distinguish *Mansky* by claiming the terms "photography" and "ballot" have "objectively ascertainable meanings." JA015. But that misses the point. The unbridled discretion given to election officials is not whether something constitutes "photography" or a "ballot"; it is approving or denying voters permission to take a ballot selfie. Just as the statute in *Mansky* gave officials power to prohibit apparel according to their own definition of "political," the Voting Enclosure Provision grants officials power to prohibit photos of voters' selves for *any* reason—lacking even the minimal guardrail *Mansky* held insufficient. *Id.* at 21–22.

**b. The Voting Enclosure Provision fails this Court's "akin to intermediate scrutiny" reasonableness test.**

The Voting Enclosure Provision is also unconstitutional under this Circuit's reasonableness test because Defendants offered only unsupported assertions of government interests, *see supra* Part I.A.2.a, and those cannot outweigh Hogarth's free speech rights. This Court gives "special solicitude" to First Amendment activity, "even in [a] nonpublic forum." *Multimedia Publ'g Co. of S.C. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993). Both before *Mansky* and after, this Court has required the government to show "more than a rational basis" for speech restrictions in nonpublic forums, subjecting content-based regulations to a balancing test to ensure "the government's means and ends must both be 'reasonable.'" *White Coat Waste Project*, 35 F.4th at 198.

The Voting Enclosure Provision here fails this Court's "akin to … intermediate scrutiny" test for reasonableness in nonpublic forums. *Id.* That test requires weighing the "degree and character of the impairment of protected expression involved" against the "validity of any asserted justification for the impairment," with "an eye to the intended

purposes" of the forum. *News & Observer*, 597 F.3d at 577 (quoting *Multimedia Publ'g*, 991 F.2d at 159). And the Voting Enclosure Provision fails that test because Defendants cannot connect their asserted interests to harms remedied by the speech-restrictive measure.

*News & Observer* is instructive. There, this Court held a ban on newspaper racks inside airport terminals failed the reasonableness test despite the government's asserted interests in aesthetics, lost revenue, avoiding congestion, and security. *Id.* at 581. The Court noted the ban "significantly restricted" publishers' expression, yet the government had negligible evidence demonstrating the validity of its asserted justifications. *Id.* at 578–81. Though the Court permitted the government to "advance its interests by arguments based on appeals to common sense and logic," it explained the government undermined its justifications by failing to distinguish newspaper racks from the "plants," "vending machines," and "trash bins," that it already permitted in terminals. *Id.*

The Voting Enclosure Provision likewise significantly "impair[s] … protected expression," *Id.* at 577–78, by empowering elections officials to deny—for any reason, or no reason at all— voter requests to take selfies. That burden on voters' speech outweighs Defendants'

claimed interests because they are both unsupported by evidence and addressed by a bevy of other on-point statutes, *see supra* Part I.A.2. And like the vending machines and trash bins *News & Observer* cited, the Voting Enclosure Provision similarly permits "other conduct that would work against" Defendants' stated interests, JA013, like photography of virtually anything else in the voting enclosure, as the State Board concedes. JA188 ("Voters can take and share other photographs taken in the voting enclosure, as long as the photographs do not include voted ballots" or other voters without permission.) That leaves Defendants' expressed justification bereft even of "common sense or logic." *News & Observer*, 597 F.3d at 579.

Yet the district court credited Defendants' bald assertions of harm as "common sense and logic," JA013, precisely the unfounded deference *News & Observer* prohibits and in contravention of this Court's instruction that the government must do more than "simply … establish that the regulation is rationally related" to its stated objective. 597 F.3d at 577 (quoting *Multimedia Publ'g*, 991 F.2d at 159). If all the government needs to do to sustain a speech-restrictive statute is point to some

conceivable interest the law could further, little would be left of the First Amendment's protections.

**2. The Ballot Photography Provisions, too, fail this Court's reasonableness test for nonpublic forums.**

Even if the Ballot Photography Provisions were not already doomed under strict or even intermediate scrutiny, they would likewise fail this Court's reasonableness test. As a threshold matter, Defendants' claimed interest in preventing vote buying is not one aimed at reserving the polling place "for its intended purposes," *Perry*, 460 U.S. at 46, so it cannot justify speech restrictions in a nonpublic forum. But even subjected to nonpublic forum analysis, the Ballot Photography Provisions fail this Circuit's "akin to … intermediate scrutiny" reasonableness test, *White Coat Waste Project*, 35 F.4th at 198, for all the same reasons as the Voting Enclosure Provision, *see supra* Part I.B.1.b.

As in *News & Observer*, the Ballot Photography Provisions enact a total ban on photos of voted ballots, thereby "significantly restrict[ing]" protected expression. 597 F.3d at 578.[14] That is an even greater burden

---

[14] Defendants' proposed substitute, photographing a sample ballot, JA182, merely amounts to an impermissible attempt to force voters to forego disfavored, but otherwise permissible expression. *See City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994) (holding the ability to pass

on speech than the Voting Enclosure Provision, readily outweighing Defendants' asserted interests in preventing "vote buying," "social coercion," "delays," "distraction," "voter intimidation," and the violation of other voters' privacy, JA172, JA179, JA185–187, because these proffered interests are unsupported by any showing that ballot selfies cause the asserted harms, *see supra* Part I.A.2.a.

And as with the Voting Enclosure Provision, Defendant's asserted interests are undermined by the existing statutes directly addressing each, *see supra* Part I.A.2.b.i., and the ability to photograph nearly anything else in the voting enclosure, *Multimedia Publ'g*, 991 F.2d at 163 (holding unconstitutional a nonpublic forum ban that "impairs important expressive activity but fails to protect effectively" the government's asserted interests). The Ballot Photography Provisions, like the Voting Enclosure Provision, are unreasonable under this Court's test and, thus, unconstitutional even in a nonpublic forum. *Id.*

---

handbills does not deprive homeowners of the First Amendment right to put up yard signs and noting laws banning whole mediums of expression pose a "readily apparent" danger to free speech); *cf. Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) (holding freedom of speech "in appropriate places" cannot be limited "on the plea it may be exercised in some other place" (citation omitted)).

## II. The district court misconstrued Hogarth's complaint by ignoring her as-applied prospective claims and neglecting her facial claims.

Despite the myriad ways the Ballot Selfie Ban violates the First Amendment, the district court granted Defendants judgment on the pleadings because it misconstrued Hogarth's complaint in two ways. First, the district court ignored Hogarth's as-applied prospective claims, improperly reasoning that her past conduct limited her ability to seek injunctive relief for future speech. Second, the district court rejected—without support—that Hogarth facially challenged the Ballot Selfie Ban to the extent they apply to all ballot selfies, not just her own, a category of relief expressly permitted by *John Doe No. 1* and *Ex parte Young*. Hogarth is entitled to judgment on the pleadings on these claims as well.

### A. The district court ignored Hogarth's as-applied prospective claim seeking relief beyond the polling place.

The decision below improperly assessed Hogarth's challenge as a retrospective as-applied claim limited to a nonpublic forum. The Verified Complaint makes crystal clear it is far broader. Hogarth's complaint challenged the Ballot Photography Provisions' ban on taking and sharing photos of her ballot—regardless of whether she casts a ballot in person or absentee. JA050 (¶ 112), JA054 (¶¶ 143–44) It also challenged the

Provisions' future enforcement against those "who take[] or share[] their own ballot selfie"—not just those who take or share a ballot selfie in a voting enclosure. JA064 (¶ F). Despite this, the district court based its analysis solely on Hogarth's past conduct "of taking 'ballot selfies' within a physical voting booth," ignoring her well-pleaded claims seeking the freedom to take and share future ballot selfies at and away from the voting enclosure. JA010.

Such prospective claims are judged on what the plaintiff seeks to do in the future, not what she did in the past. Consider two Supreme Court examples. In *Holder v. Humanitarian Law Project*, the Court analyzed claims against a challenged statute as it would apply to "what plaintiffs want to do." 561 U.S. 1, 28 (2010). And in *303 Creative LLC v. Elenis*, the Court considered prospective claims against an antidiscrimination law based on how it would apply to wedding websites the plaintiff "seeks to create," even though she had never created wedding websites before. 600 U.S. 570, 587 (2023). Hogarth's prospective claims, which the district court ignored, similarly seek relief for what she wishes to do.

A third Supreme Court case is instructive on the relationship between past conduct and prospective claims. In *Olivier v. City of Brandon*,

the Court held a Section 1983 plaintiff's past conviction under an ordinance did not preclude his First Amendment claims to enjoin the ordinance's future enforcement against him. 146 S. Ct. 916, 920, 923 (2026). The Court explained that prospective relief "is not about what [a plaintiff] did in the past" but "merely attempts to prevent a future prosecution." *Id.* at 923–24.

Taken together, *Holder*, *303 Creative*, and *Olivier* make clear that Hogarth's claims for prospective relief turn on what she seeks to do in the future: take and share ballot selfies inside and outside the voting enclosure. JA050. The district court thus should have analyzed the Ballot Photography Provisions based on how they apply to that intended conduct.

### B. The district court neglected Hogarth's facial claim seeking relief against laws banning ballot selfies.

The district court also improperly ignored that Hogarth facially challenged the Ballot Selfie Ban to enjoin the statutes' enforcement against all North Carolinians, not just herself. Not only did the Supreme Court authorize this form of relief in *Ex parte Young*, 209 U.S. 123, its recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), reaffirms its availability to Hogarth. Because the facial challenge is properly before

this Court and seeks a traditional equitable remedy, this Court should reverse the district court's implicit dismissal of this claim and direct entry of judgment in Hogarth's favor.

#### 1. Hogarth properly raised facial claims because her complaint goes beyond her own circumstances.

Hogarth, as "the master of the complaint," "gets to determine which substantive claims to bring." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987)). She decided to bring as-applied claims limited to her own circumstances, *see, e.g.*, JA064 (¶¶ B, E, G, H), and facial claims extending beyond her own circumstances, *see, e.g.*, JA063–064 (¶¶ A, C, D, F). Hogarth alleged the ban violated "her and all North Carolina voters' First Amendment rights" and placed her "and other voters" at risk of prosecution. JA035, JA052. She also claimed the ban violated the First Amendment as applied to any ballot selfies, not just as applied to her own. *See, e.g.*, JA057 (¶¶ 166–67), JA060 (¶¶ 184–85). And she asked for relief beyond her circumstances, requesting in her complaint declarations and injunctions reaching all ballot selfies, JA064 (¶¶ A, C, D, F), which she reaffirmed in her motion for judgment on the pleadings, JA203.

The district court, however, misread *John Doe No. 1* in mistakenly concluding Hogarth presented only "an as-applied challenge to the five statues." JA010. In *John Doe*, a referendum's supporters sued to enjoin an officer from using a state's Public Records Act to reveal supporters' names. 561 U.S. at 193. The complaint claimed the act was "unconstitutional as applied to referendum petitions." *Id.* The parties disagreed whether that claim was facial or as applied. *Id.* at 194. The Supreme Court noted the claim "obviously has characteristics of both." *Id.* It was as applied in "that it does not seek to strike the [law] in all its applications, but only to the extent it covers referendum petitions." *Id.* And it was facial "in that it is not limited to plaintiffs' particular case, but challenges application of the law more broadly to all referendum petitions." *Id.*

The Court went on to explain that the label is "not what matters." *Id.* "The important point is that plaintiffs' claim and the relief that would follow … reach beyond the particular circumstances of these plaintiffs." *Id.* So the Court examined the Public Records Act on its face "to the extent of that reach" to all referendum petitions. *Id.*

Circuits uniformly read *John Doe* as permitting a facial challenge to a specific subset of a statute's applications.[15] Yet the district court, citing no authority, split from five circuit courts, rejected *John Doe* as allowing "a third category," and declared the *John Doe* Court determined the complaint raised a facial challenge. JA009–010. That conclusion contradicts *John Doe* and cannot stand.[16]

Hogarth thus raised a facial claim limited to the statues' application against ballot selfies, and *John Doe* allows that facial claim. The court must therefore analyze her challenge under the standards for a

[15] *See, e.g.*, *McGuire v. Marshall*, 50 F.4th 986, 1003–04 (11th Cir. 2022) (per curiam) (interpreting *John Doe* to allow "quasi-facial claims"); *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 915 (10th Cir. 2016) (interpreting *John Doe* to allow "dual claims"); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 826 (1st Cir. 2020) (interpreting *John Doe* to allow "half-fish, half-fowl First Amendment challenges"); *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015) (interpreting *John Doe* to allow claims with "characteristics of as-applied and facial" suits); *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 426 (5th Cir. 2014) (same).

[16] And if it does stand and the *John Doe* plaintiff raised a facial challenge, then so did Hogarth because her claim mirrors John Doe's. *Compare John Doe*, 561 U.S. at 194 (claiming the law "violates the First Amendment as applied to referendum petitions"), *with* JA064 (¶¶ C–D) (claiming the Ballot Selfie Ban "violates the First Amendment as applied to ballot selfies").

facial challenge "to the extent" the statutes apply to ballot selfies. *John Doe*, 561 U.S. at 194. And as explained above, the Ballot Selfie Ban fails First Amendment scrutiny. *See supra* Part I.

#### 2. Hogarth is entitled to a traditional equitable remedy permitted by *Ex parte Young* and reaffirmed by *CASA*.

The district court also erroneously relied on *CASA* to ignore Hogarth's facial challenge. As an initial matter, neither party in this case briefed nor cited *CASA*, which the Supreme Court issued before the parties started Rule 12(c) briefing. Nevertheless, in a single paragraph, the district court reasoned that "paragraph F of [Hogarth's] prayer for relief requests an injunction squarely barred by *CASA*," and "shorn of paragraph F, the prayer for relief and the rest of the complaint presents as-applied challenges." JA009. That is not only a factual misreading of the complaint, *see supra* Part II.B.1, but also a legal misapplication of *CASA*, which reaffirmed the *Ex parte Young* relief Hogarth seeks and considered only what type of relief courts can issue, not what claims they can hear.

*Ex parte Young* allows plaintiffs like Hogarth to sue state officials in their official capacities and request injunctions preventing them from enforcing unconstitutional state laws. 209 U.S. 123. In fact, Hogarth's

requested relief is identical in form to the relief in *Ex parte Young*: Both sought to prevent a state official from enforcing unconstitutional state laws. *Compare id.* at 129 (seeking "to enjoin … defendants from attempting to enforce such provisions"), *with* JA064 (¶ F) (seeking to enjoin state officials from enforcing Ballot Selfie Ban). For over a century, *Ex parte Young* injunctions have prevented states from enforcing unconstitutional laws against anyone, not just the suing plaintiffs. 209 U.S. at 166–67 (noting "the necessary result of upholding this suit" will be "one Federal judge would have it in his power to enjoin proceedings by state officials to enforce the legislative acts").

Before and after *Ex parte Young*, the Supreme Court affirmed injunctions broadly preventing enforcement of unconstitutional state laws. *See, e.g.*, *Reagan v. Farmers' Loan & Tr. Co.*, 154 U.S. 362, 413 (1894) (affirming injunction "restrain[ing] the defendants from enforcing the rates already established"); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 533–34 (1925) (affirming injunction against Oregon's compulsory public schooling law). The injunction Hogarth seeks is no different.

The district court, however, interpreted *CASA* as barring injunctive relief against unconstitutional *state* laws, even though *CASA* concerned

only injunctions barring *federal* officials from enforcing a federal policy nationwide. JA009. Read properly, *CASA* did not limit suits requesting injunctions to prevent state officials from enforcing unconstitutional state laws. 606 U.S. at 837 n.1. In fact, *CASA* explicitly acknowledged that *Ex parte Young* suits against state action are justified "by reference to a long line of cases." *Id.* at 846 n.9 (citing *Osborn v. Bank of the U.S.*, 22 U.S. (9 Wheat.) 738 (1824); *Governor of Ga. v. Madrazo*, 26 U.S. (1 Pet.) 110 (1828); *Davis v. Gray*, 83 U.S. (16 Wall.) 203 (1872)).

Federal courts have thus continued to grant *Ex parte Young* injunctions against unconstitutional state laws after *CASA*. The month after the Supreme Court decided *CASA*, for example, a district court issued a statewide injunction against a Tennessee statute prohibiting counseling pregnant minors about out-of-state abortions. *Welty v. Dunaway*, 791 F. Supp. 3d 818, 843 (M.D. Tenn. 2025), *appeal docketed*, No. 25-5739 (6th Cir. Aug. 19, 2025). The court noted *CASA* recognized "statewide injunctions appear to have more historical support" than universal injunctions and noted *CASA* did not address "the need for broader injunctions in the First Amendment context." *Id.*; *see also OUTMemphis v. Lee*, No. 2:23-CV-2670, 2026 WL 881226, at *34 n.22 (W.D. Tenn. Mar. 31, 2026) ("In

*CASA*, the Supreme Court limited the use of universal injunctions, not statewide injunctions ….”), *appeal docketed sub nom.*, *OUTMemphis v. Skrmetti*, No. 26-5346 (6th Cir. Apr. 21, 2026).

Assuming this Court reads *CASA* as limiting Hogarth's injunctive relief, it must still consider her facial challenge because it can issue a facial declaratory ruling holding the Ballot Selfie Ban unconstitutional to the extent it applies to ballot selfies, even if any injunction ultimately protects only Hogarth. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615, 619 (2021) (holding donor disclosure requirement facially violated the First Amendment while reinstating injunction applying only to plaintiffs). That's because *CASA* concerned only remedy, 606 U.S. at 839–40, and does not require courts to ignore facial claims as the district court did below, *see Biden v. Texas*, 597 U.S. 785, 798 (2022) (holding courts inability "to issue a specific category of remedies" does not limit its "subject matter jurisdiction"); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (reaffirming court's "virtually unflagging" obligation to decide cases "within its jurisdiction").

Thus, if the district court believed *CASA* mandated a narrower injunction, it still had to "hear and decide" Hogarth's facial challenge to the Ballot Selfie Ban. *Lexmark Int'l*, 572 U.S. at 126. So, too, must this Court.

## III. The Court should remand for entry of judgment on the pleadings for Hogarth because the Ballot Selfie Ban is unconstitutional as a matter of law.

This Court should reverse the judgment below and remand with instructions to enter judgment on the pleadings for Hogarth on all claims, because the Ballot Selfie Ban violates the First Amendment. *See supra* Part I. Specifically, the Ballot Photography Provision fails strict scrutiny because North Carolina lacks a compelling interest in banning ballot selfies and in any case failed to narrowly tailor the Provision. *See supra* Part I.A. And the Voting Enclosure Provision is unconstitutional because it is not a reasonable means of preserving polling places for their intended purpose. *See supra* Part I.B.1.

The Ballot Selfie Ban's unconstitutional nature is clear whether applied to Hogarth or to any other North Carolinian. That is because "the pertinent facts" are the same for Hogarth as for any other voter. *Ams. for Prosperity Found.*, 594 U.S. at 618. No matter the voter, the Ballot Photography Provisions' "lack of tailoring" is "categorical—present in every

case—as is the weakness of the State's interest." *Id.* at 615; *see supra* Part I.A.2 (explaining the lack of tailoring and weakness of state's interest). And regardless of who takes the ballot selfie, the Voting Enclosure Provision violates the First Amendment by failing to be a reasonable speech restriction. *See supra* § I.B.1. Thus, because the provisions fail to pass First Amendment scrutiny, a more stringent facial standard is "not required." *Ams. for Prosperity Found.*, 594 U.S. at 617. The Ballot Selfie Ban is unconstitutional as applied and facially.

As there are only legal questions, a remand without instructions to enter judgment "would only delay decision without service of any useful purpose." *Evans v. Cunningham*, 335 F.2d 491, 494 (4th Cir. 1964). Hogarth's claims involve "no factual questions to resolve," as evidenced by the parties' decision to cross-motion for judgment on the pleadings. *Id.* This appeal will present the Court "with all the legal arguments," so it is "appropriate to reach the merits" of all aspects of the case. *aaiPharma Inc. v. Thompson*, 296 F.3d 227, 235 (4th Cir. 2002). The Court should thus hold the Ballot Selfie Ban violates the First Amendment as applied and facially, direct entry of judgment for Hogarth on all claims and, as the First Circuit did, invalidate the Ballot Selfie Ban.

## CONCLUSION

The district court's judgment should be reversed, and this case should be remanded with instructions to enter judgment on the pleadings in favor of Hogarth on both her as-applied and facial claims.

## REQUEST FOR ORAL ARGUMENT

Under Local Rule 34(a), Plaintiff Susan Hogarth requests oral argument because the First Amendment issues raised in this appeal have not been authoritatively decided and oral argument would significantly aid the Court in deciding the issues presented.

Dated: May 1, 2026

Respectfully submitted,

/s/ *Jeffrey D. Zeman*

James M. Dedman IV
(NC Bar # 37415)
GALLIVAN WHITE & BOYD P.A.
6805 Carnegie Blvd Ste. 200
Charlotte, NC, 28211
(704)-552-1712
jdedman@gwblawfirm.com

Jeffrey D. Zeman
(Pa. Bar No. 328570)
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
jeff.zeman@fire.org

Daniel A. Zahn
(DC Bar No. 90027403)
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
daniel.zahn@fire.org

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies under Federal Rule of Appellate Procedure 32(g) that Plaintiff-Appellant's Opening Brief meets the applicable formatting, volume, typeface, and style requirements. This brief was prepared in Microsoft Word in 14-point Century Schoolbook font and contains 11,408 words, excluding items identified under Federal Rule of Appellate Procedure 32(f).

Dated: May 1, 2026

/s/ *Jeffrey D. Zeman*
Jeffrey D. Zeman
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION