No. 26-1328

In the United States Court of Appeals
for the Fourth Circuit

SUSAN JANE HOGARTH,

*Plaintiff-Appellant*,

v.

SAM HAYES, Executive Director of the North Carolina State Board of Elections, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Eastern District of North Carolina

**RESPONSE BRIEF OF DEFENDANTS-APPELLEES**

JEFF JACKSON
Attorney General

Nicholas S. Brod
Solicitor General

Thad Eagles
Deputy Solicitor General

Mary Lucasse
Special Deputy Attorney General

Mary Scruggs
Special Deputy Attorney General

North Carolina Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

*Counsel for State Board Defendants-Appellees*

*(Additional counsel listed on inside cover)*

Elizabeth Curran O'Brien
Special Deputy Attorney General

North Carolina Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

*Counsel for Defendant-Appellee Freeman*

Roger Askew
County Attorney

Allison P. Cooper
Senior Deputy County Attorney

Wake County Attorney's Office
Post Office Box 550
Raleigh, NC 27602
(919) 856-5500

*Counsel for County Board Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

I certify, pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, that no appellee is in any part a publicly held corporation, a publicly held entity, or a trade association, and that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation.

Dated: June 1, 2026

/s/ Thad Eagles
Thad Eagles

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ iii

ISSUES PRESENTED ........ 1

INTRODUCTION ........ 2

STATEMENT OF THE CASE ........ 5

A. Statutory Background ........ 5

B. Hogarth violates the law, and the district court grants judgment to defendants. ........ 7

SUMMARY OF THE ARGUMENT ........ 8

ARGUMENT ........ 11

I. The Challenged Laws Are Subject To And Survive Nonpublic Forum Scrutiny. ........ 11

A. The challenged laws reasonably serve permissible government ends. ........ 12

B. The Voting Enclosure Provision is subject to objective, workable standards. ........ 28

C. Hogarth's arguments against nonpublic forum scrutiny as to the Ballot Photography Provisions fail. ........ 30

D. The Fourth Circuit does not require a stricter means-end fit than the Supreme Court has mandated. ........ 36

II. The Ballot Photography Provisions Are Subject To And Survive The Flexible Review For Voting Regulations. ........ 38

A. Alternatively, the Ballot Photography Provisions are subject to and survive strict scrutiny under *Burson*. .......................... 39

B. Alternatively, the Ballot Photography Provisions are subject to and survive the *Anderson-Burdick* test. ............................ 45

III. The Ballot Photography Provisions Survive Any Other Level Of Scrutiny ........................................................................... 50

A. The Ballot Photography Provisions are permissible, content-neutral restrictions. ............................................................... 50

B. The Ballot Photography Provisions are constitutional under strict scrutiny. ........................................................................ 57

CONCLUSION ............................................................................. 58

CERTIFICATE OF COMPLIANCE ................................................... 60

CERTIFICATE OF SERVICE ........................................................ 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Party of Texas v. White*,
415 U.S. 767 (1974) .......... 40

*Anderson v.* Celebrezze,
460 U.S. 780 (1983) .......... 49

*Billups v. City of Charleston, S.C.*,
961 F.3d 673 (4th Cir. 2020) .......... 54

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) .......... 27

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) .......... 41

*Brown v. Hartlage*,
456 U.S. 45 (1982) .......... 58

*Burdick v. Takushi*,
504 U.S. 428 (1992) .......... passim

*Burson v. Freeman*,
504 U.S. 191 (1992) .......... passim

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) .......... 50, 51, 52, 53

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) .......... 53, 55

*Coal. for Good Governance v. Kemp*,
558 F. Supp. 3d 1370 (N.D. Ga. 2021) .......... 51

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*,
473 U.S. 788 (1985) .................................................... 15, 30, 34

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) .................................................... 17, 45, 46

*Crookston v. Johnson*,
841 F.3d 396 (6th Cir. 2016) .................................................... passim

*Duke v. Asbee*,
33 N.C. 112 (1850) .................................................... 20

*Educ. Media Co. at Va. Tech v. Swecker*,
602 F.3d 583 (4th Cir. 2010) .................................................... 54

*Evans v. Reiser*,
2 P.2d 615 (Utah 1931) .................................................... 21

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) .................................................... 54, 56

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019) .................................................... passim

*George v. Mun. Election Comm'n of City of Charleston*,
516 S.E.2d 206 (S.C. 1999) .................................................... 19

*Griffin v. Dep't of Veterans,*
*Affs.*, 106 F. App'x 816 (4th Cir. 2004) .................................................... 37

*Griffin v. Dep't of Veterans,*
*Affs.*, 274 F.3d 818 (4th Cir. 2001) .................................................... 12, 16, 36, 37

*Hebb v. City of Asheville*,
145 F.4th 421 (4th Cir. 2025) .................................................... 15, 44

*Hill v. Colorado*,
530 U.S. 703 (2000) .................................................... 57

*Hodge v. Talkin*,
799 F.3d 1145 (D.C. Cir. 2015) .......... 35

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) .......... 57

*In re Caldwell Cnty. Election Protests*,
600 S.E.2d 901 (N.C. Ct. App. 2004) .......... 23

*Indiana C.L. Union Found., Inc. v. Indiana Sec'y of State*,
229 F. Supp. 3d 817 (S.D. Ind. 2017) .......... 51

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
505 U.S. 672 (1992) .......... 11

*Jenness v. Fortson*,
403 U.S. 431 (1971) .......... 40

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) .......... 19

*Kendall v. Balcerzak*,
650 F.3d 515 (4th Cir. 2011) .......... 49, 50

*La Union del Pueblo Entero v. Abbott*,
167 F.4th 743 (5th Cir. 2026) .......... 47

*Lee v. Va. State Bd. of Elections*,
843 F.3d 592 (4th Cir. 2016) .......... 27

*Libertarian Party of Va. v. Alcorn*,
826 F.3d 708 (4th Cir. 2016) .......... 13, 14, 16, 43

*Mazo v. New Jersey Sec'y of State*,
54 F.4th 124 (3d Cir. 2022) .......... 47, 49, 52

*McCullen v. Coakley*,
573 U.S. 464 (2014) .......... 51, 56, 57

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .......... 2, 47, 48

*McKay v. Federspiel*,
No. 14-CV-10252, 2014 WL 7013574 (E.D. Mich. Dec. 11, 2014) .......... 32

*McLaughlin v. N.C. Bd. of Elections*,
65 F.3d 1215 (4th Cir. 1995) .......... 45

*Minn. Voters All. v. Mansky*,
585 U.S. 1 (2018) .......... passim

*Multimedia Publishing Co. v. Greenville-Spartanburg Airport District*,
991 F.2d 154 (4th Cir. 1993) .......... 37, 38

*Munro v. Socialist Workers Party*,
479 U.S. 189 (1986) .......... 39, 40, 41

*The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
597 F.3d 570 (4th Cir. 2010) .......... 17, 37, 38

*Oettle v. Guthrie*,
189 N.E.3d 22 (Ill. App. Ct. 2020) .......... 13, 22, 30, 58

*Page v. Lexington Cnty. Sch. Dist. One*,
531 F.3d 275 (4th Cir. 2008) .......... 30

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
460 U.S. 37 (1983) .......... 37

*PETA v. N.C. Farm Bureau Fed'n, Inc.*,
60 F.4th 815 (4th Cir. 2023) .......... 33, 49

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023) .......... 52

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 51

*Reynolds v. Sims*,
377 U.S. 533 (1964) .......... 58

*Rideout v. Gardner*,
123 F. Supp. 3d 218 (D.N.H. 2015) .......... 51

*Rideout v. Gardner*,
838 F.3d 65 (1st Cir. 2016) .......... 40

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 31

*Ross v. Early*,
746 F.3d 546 (4th Cir. 2014) .......... 43, 45, 54

*Silberberg v. Bd. of Elections of N.Y.*,
272 F. Supp. 3d 454 (S.D.N.Y. 2017) .......... passim

*Storer v. Brown*,
415 U.S. 724 (1974) .......... 40

*Thomas v. Chicago Park Dist.*,
534 U.S. 316 (2002) .......... 29, 30

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025) .......... 16, 56

*Timmons v. Twin Cities Area New Party,*
520 U.S. 351 (1997) .......... 33, 43, 44

*Turner Broad. Sys., Inc. v. F.C.C.*,
520 U.S. 180 (1997) .......... 54

*United States v. Adams*,
722 F.3d 788 (6th Cir. 2013) .......... 24, 25, 26

*United States v. Arthur*,
160 F.4th 597 (4th Cir. 2025) ........................................................ 26

*United States v. Carmichael*,
685 F.2d 903 (4th Cir. 1982) .......................................................... 25

*United States v. Garcia*,
719 F.2d 99 (5th Cir. 1983) ............................................................ 24

*United States v. Gileno*,
350 F. Supp. 3d 910 (C.D. Cal. 2018) ............................................. 31

*United States v. Grace*,
461 U.S. 171 (1983) ........................................................................ 35

*United States v. Jones*,
408 F. App'x 949 (6th Cir. 2011) ..................................................... 24

*United States v. Kokinda*,
497 U.S. 720 (1990) ................................................................. 12, 16

*United States v. Madden*,
403 F.3d 347 (6th Cir. 2005) .......................................................... 24

*United States v. Malmay*,
671 F.2d 869 (5th Cir. 1982) .......................................................... 25

*United States v. McCranie*,
169 F.3d 723 (11th Cir. 1999) ........................................................ 24

*United States v. McLean*,
808 F.2d 1044 (4th Cir. 1987) ................................................. 24, 26

*United States v. Odom*,
858 F.2d 664 (11th Cir. 1988) ........................................................ 24

*United States v. Raia*,
993 F.3d 185 (3d Cir. 2021) .................................................... 24, 25

*United States v. Risner*,
737 F. App'x 751 (6th Cir. 2018)....................24, 26

*United States v. Robinson*,
813 F.3d 251 (6th Cir. 2016)....................24, 25

*United States v. Shatley*,
448 F.3d 264 (4th Cir. 2006)....................23

*United States v. Shrout*,
298 F. App'x 479 (6th Cir. 2008)....................24, 26

*United States v. Slone*,
411 F.3d 643 (6th Cir. 2005)....................24

*United States v. Smilowitz*,
974 F.3d 155 (2d Cir. 2020) ....................24

*United States v. Smith*,
139 F. App'x 681 (6th Cir. 2005)....................24, 26

*United States v. Smith*,
No. CR 21-152, 2023 WL 2043307 (E.D. La. Feb. 16, 2023)....................24

*United States v. Thomas*,
510 F.3d 714 (7th Cir. 2007)....................24

*United States v. Turner*,
536 F. App'x. 614 (6th Cir. 2013)....................24

*United States v. Young*,
516 F. App'x 599 (6th Cir. 2013)....................24

*Walden v. Kosinski*,
153 F.4th 118 (2d Cir. 2025)....................34, 47

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)....................55, 56

*White Coat Waste Project v. Greater Richmond Transit Co.*,
35 F.4th 179 (4th Cir. 2022) ........................................................ 28, 36

*Wood v. Meadows*,
207 F.3d 708 (4th Cir. 2000) ........................................................... 46

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ........................................................................ 29

**Statutes**

18 U.S.C. § 641 .............................................................................. 32
18 U.S.C. § 793 .............................................................................. 32
18 U.S.C. § 795 .............................................................................. 31
18 U.S.C. § 797 .............................................................................. 32
18 U.S.C. § 798 .............................................................................. 32
18 U.S.C. § 2511(1)(c) ..................................................................... 32
Alaska Stat. § 15.15.280 ..................................................................... 7
Ariz. Rev. Stat. § 16-515(G) ............................................................ 6, 7
Ga. Code § 21-2-568.2 ......................................................................... 6
La. Stat. § 18:1461.7(A)(2) ................................................................. 7
Mass. Gen. Laws ch. 56, § 25 ............................................................. 7
Minn. Stat. § 204C.17 .......................................................................... 7
Miss. Code § 97-13-45 .......................................................................... 7
Mo. Rev. Stat. § 115.637(14) ............................................................... 7
N.C. Gen. Stat. § 163-47 ............................................................ 5, 28, 29
N.C. Gen. Stat. § 163-48 ............................................................ 6, 28, 29
N.C. Gen. Stat. § 163-165.1(e) ............................................................ 6
N.C. Gen. Stat. § 163-166.3 ............................................................. 5, 6
N.C. Gen. Stat. § 163-273(a)(1) ........................................................... 6
N.C. Gen. Stat. § 163-274(b)(1) ...................................................... 6, 26
N.J. Stat. § 19:15-26 ............................................................................ 7
N.J. Stat. § 19:34-7 .............................................................................. 7
N.Y. Election Law § 17-130(10) ........................................................... 7
Nev. Rev. Stat. § 293.274(2) ............................................................. 6, 7
Nev. Rev. Stat. § 293.730(1)(e) ............................................................ 7
Ohio Rev. Code § 3501.35(A)(4) ........................................................... 7
Ohio Rev. Code § 3599.20 .................................................................... 7
S.C. Code § 7-25-100(A)(1) .................................................................. 7

S.D. Codified Laws § 12-18-27 ........ 7
Tenn. Code. § 2-7-142 ........ 6, 7
Tex. Elec. Code § 61-014 ........ 6, 7
W. Va. Code § 3-4A-23 ........ 6, 7
Wis. Stat. § 12.13(1)(f) ........ 7

**Other Authorities**

S. Rep. No. 497, 46th Cong., 2d Sess., 2-5 (1880) ........ 20

John C. Fortier & Norman J. Ornstein *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. Reform 483 (2003) ........ 19

John H. Wigmore, The Australian Ballot System as Embodied in the Legislation of Various Countries, 50-51 (1889) ........ 19, 20, 21

Richard L. Hasen,*Vote Buying*, 88 Cal. L. Rev. 1323 (2000) ........ 21, 22,

William E. Schmidt, *No More Selling of Votes?*, N.Y. Times, Oct. 15, 1986 ........ 23

Dep't of Just., Press Release No. 14-1336, (Dec. 1, 2014) ........ 25

Dep't of Just., Report to Congress on the Activities and Operations of the Public Integrity Section for 1986 at 21-22 (1987) ........ 23

Indictment, *United States v. Ortiz-Vazquez*, 3:24-cr-456, at 9 (D.P.R. Dec. 12, 2024) ........ 25

Oliver Max Gardner, *Public Papers of Oliver Max Gardner: Governor of North Carolina, 1929-1933*, 7 (Edwin Maurice Gill ed. 1937) ........ 27

## ISSUES PRESENTED

I. Whether defendants are entitled to judgment on the pleadings as to Hogarth's claim that requiring voters to obtain permission from election officials before taking a photograph of themselves within the voting enclosure violates the First Amendment.

II. Whether defendants are entitled to judgment on the pleadings as to Hogarth's claim that barring voters from taking and disseminating photographs of their marked ballots violates the First Amendment.

## INTRODUCTION

"[T]he history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud." *Burson v. Freeman*, 504 U.S. 191, 206 (1992) (plurality). For a century, "the failure of the law to secure secrecy" led to widespread "bribery and intimidation." *Id.* at 200-01 (cleaned up). In response, "all 50 States, together with numerous other Western democracies, settled on the same solution: a secret ballot." *Id.* at 206. Thanks to the secret ballot, "[a]pproaching the polling place" is no longer "akin to entering an open auction." *Id.* at 202. And the "secret ballot" now protects "the hard-won right to vote one's conscience without fear of retaliation." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995).

A ballot is not secret if it is shared. North Carolina therefore prohibits taking and sharing photographs of official marked ballots.

Hogarth contends that the State cannot justify that prohibition unless it identifies past instances of vote buying and coercion that specifically involve ballot selfies. On her theory, it does not matter that the secret ballot freed American politics from the stranglehold of vote buying and voter coercion. It does not matter that vote buying and

intimidation schemes continue and are difficult to detect. It does not matter that snapping a picture with a cell phone is an easy, obvious way to provide proof that such schemes require. And it does not matter that some pressure cannot plausibly sustain a conviction—consider, for example, a person experiencing domestic violence who, though not explicitly threatened, fears what will happen if their abuser learns that they voted against the abuser's preferred candidate.

If Hogarth is correct, then the State must ignore all that, wait until its voters and the integrity of its elections are injured, hope the scheme is uncovered, then return to court for permission to enforce the common-sense measures that Hogarth has sued to enjoin.

Fortunately, Hogarth is mistaken. She argues that strict scrutiny applies and requires this exacting, selfie-specific evidence. But polling places and ballots themselves (whether absentee or in-person) are nonpublic fora, triggering far more deferential review. Moreover, the Supreme Court and this Court have adopted more flexible standards to review laws, like these, that balance free speech rights with the fundamental right to free and fair elections. Finally, even if the Court ignores both the nonpublic fora and electoral context, the challenged

laws are content neutral and so subject to intermediate scrutiny.

These tests do not require evidence of past harms stemming specifically from ballot selfies. Because Hogarth rests her claim on the absence of such evidence, her claim fails. But the challenged laws survive even strict scrutiny, given the secret ballot's proven role in preserving free and fair elections and the obvious threat to ballot secrecy posed by taking and sharing pictures of marked ballots.

Hogarth also challenges the requirement that she obtain permission before taking a selfie in the voting enclosure. She concedes that the law provides election officials with concrete and workable direction regarding such requests. She argues the law is nonetheless constitutionally infirm because it does not expressly foreclose arbitrary denials that conflict with that statutory direction. Hogarth misreads the law. If taking a selfie would not cause delay or disorder—for example, because there is no line and the selfie can be taken without risk to others' privacy—then election officials must grant permission.

The First Amendment protects Hogarth's right to tell the world how she cast her ballot and why. She can announce her vote on social media, circulate leaflets, march in a parade, put up yard signs and

billboards, or write it in the sky. She can amplify that message by posting selfies taken outside the polling place, while waiting in line, or (with permission) while standing inside the voting enclosure. But the First Amendment is not a license to delay or disturb other North Carolinians who are trying to exercise their constitutional right to vote. Nor does it foreclose North Carolina's efforts to maintain the secret ballot and preserve free and fair elections. Elections in North Carolina are safe, secure, and reliable. They should remain so.

## STATEMENT OF THE CASE

### A. Statutory Background

The "Voting Enclosure Provision" makes it illegal to "photograph, videotape, or otherwise record the image of any voter within the voting enclosure, except with the permission of both the voter and the chief judge of the precinct." N.C. Gen. Stat. § 163-166.3(b). Permission from the chief judge is not required for pictures of candidates. *Id.* Voters wishing to take a selfie need permission from only the chief judge of the precinct. *See id.* The "[p]owers and duties of chief judges" are enumerated by statute. N.C. Gen. Stat. § 163-47. As relevant here, they "shall especially keep open and unobstructed … the place of ...

voting," "prevent and stop … attempts to obstruct, intimidate, or interfere" with voters, and prevent "disorder." N.C. Gen. Stat. § 163-48.

By permitting selfies (except with a marked ballot), North Carolina is far more solicitous of the First Amendment than several other states that wholesale ban photography within the voting booth. *See, e.g.*, Ga. Code § 21-2-568.2; Nev. Rev. Stat. § 293.274(2); Tenn. Code. § 2-7-142; W. Va. Code § 3-4A-23. Indeed, some states forbid photography even *around* the polling location. *See, e.g.*, Tex. Elec. Code § 61-014(b) (100 feet); Ariz. Rev. Stat. § 16-515(G) (75 feet).

North Carolina's "Ballot Photography Provisions" bar taking and sharing pictures of official marked ballots. Namely, it is illegal to "photograph, videotape, or otherwise record the image of a voted official ballot for any purpose not otherwise permitted under law." N.C. Gen. Stat. § 163-166.3(c). State law also bars sharing such pictures. Section 163-273(a)(1) makes it a misdemeanor for a voter "to allow his ballot to be seen by any person" except as permitted by statute. Section 163-165.1(e) provides that only election officials "may have access to voted ballots or paper or electronic records of individual voted ballots." Hogarth also points to Section 163-274(b)(1), which makes it a

misdemeanor for those with illegal access to a voting record to "knowingly disclose ... how an individual has voted that ballot."

At least ten other states have similar bans on taking or sharing photographs of marked ballots.[1] At least seven ban photographs of ballots marked during in-person voting.[2] Many of the states that permit ballot selfies began doing so only recently. Br. 30-31.

### B. Hogarth violates the law, and the district court grants judgment to defendants.

During the 2024 primary elections, plaintiff Susan Hogarth took a selfie showing her marked ballot and shared it on social media. JA44-45. She received a letter from the State Board of Elections notifying her that taking the photograph appeared to violate the law. JA68.

Hogarth sued. She sought an injunction and declaration that the Ballot Photography Provisions and Voting Enclosure Provision violated the First Amendment as applied to voters taking and sharing pictures

---

[1] Alaska Stat. § 15.15.280; La. Stat. § 18:1461.7(A)(2); Mass. Gen. Laws ch. 56, § 25; Miss. Code § 97-13-45; Mo. Rev. Stat. § 115.637(14); Nev. Rev. Stat. § 293.730(1)(e); N.Y. Election Law § 17-130(10); Ohio Rev. Code §§ 3501.35(A)(4), 3599.20; S.C. Code § 7-25-100(A)(1); S.D. Codified Laws § 12-18-27; Wis. Stat. § 12.13(1)(f).

[2] Ariz. Rev. Stat. § 16-515(G); Minn. Stat. § 204C.17; Nev. Rev. Stat. § 293.274(2); N.J. Stat. §§ 19:15-26, 19:34-7; Tenn. Code § 2-7-142; Tex. Elec. Code § 61-014; W. Va. Code § 3-4A-23.

of themselves and their marked ballots, and specifically as applied in the letter from the State Board. JA53-65.

The district court granted defendants' motion for judgment on the pleadings. JA1-17. It held that nonpublic forum scrutiny applied and the laws reasonably prevent ballot selfies from being used to prove "compliance in a vote-buying scheme" or "submission to a would-be vote intimidator's demands." JA11-12. Defendants were not required to provide "concrete examples of vote-buying or intimidation schemes foiled by the challenged statutes." JA14. The district court also held that the challenged laws are capable of reasoned application. JA14-15.

This appeal followed.

## SUMMARY OF THE ARGUMENT

**I.A:** The challenged laws are subject to and survive nonpublic forum scrutiny, which requires that the laws be viewpoint neutral and reasonably serve permissible government ends. There is no dispute that the laws are viewpoint neutral and the State's objectives are permissible. Bowing to a long line of precedent, Hogarth does not argue that this standard requires selfie-specific evidence. Both the Voting Enclosure Provision and the Ballot Photography Provisions protect

against delays and distractions at the polls. History and common sense confirm that the Ballot Photography Provisions also protect against vote buying, voter intimidation, and social coercion, and preserve confidence in election integrity.

**I.B:** As to the Voting Enclosure Provision, Hogarth concedes that the law offers sufficiently concrete and workable direction to election officials. She argues the law falls short by not explicitly making that direction mandatory. That argument fails. The Supreme Court has rejected similar formalistic arguments, and election officials cannot ignore these statutory guardrails because they have only the authority granted them by statute.

**I.C:** Hogarth seeks strict scrutiny as to the Ballot Photography Provisions because they apply not just during in-person voting, but also prohibit photographs of marked absentee ballots and sharing pictures of marked ballots regardless of where those photographs are taken or shared. But the ballot itself is a nonpublic forum. Restrictions on nonpublic means of communication are subject to nonpublic forum review even if the plaintiff can access those means of communication from a public place. At a minimum, even if other bans are analyzed

under a different rubric, it would not change the analysis as applied to in-person voting. When a restriction applies in different, easily distinguishable fora, courts apply the appropriate scrutiny to each.

**I.D:** Hogarth also attempts to escape nonpublic forum scrutiny by arguing that the Fourth Circuit has adopted a more demanding test than that which the Supreme Court mandates. This Court has not done so, and indeed it could not. Regardless, the challenged laws survive even under Hogarth's proposed balancing test.

**II.** The Ballot Photography Provisions are not subject to strict scrutiny for the additional reason that they reconcile free speech rights with the State's critical interest in ensuring that elections reflect the free choices of each voter. **II.A:** The Supreme Court in *Burson* allowed states to strike that balance with reasonable restrictions that do not significantly impinge on free speech. The challenged laws meet that test. **II.B:** This Court has used the *Anderson-Burdick* test to address similar conflicts between fundamental rights. The challenged laws are reasonable and non-discriminatory and so meet that test as well.

**III.A:** The Ballot Photography Provisions also survive because they are content neutral and subject to at most intermediate scrutiny.

Intermediate scrutiny does not require ignoring that the secret ballot has deterred widespread vote buying and intimidation in the past, or that those harms are difficult to detect and would be facilitated by photographs of marked ballots today. **III.B:** For similar reasons, the Ballot Photography Provisions survive even strict scrutiny.

This Court should affirm.

## ARGUMENT

### I. The Challenged Laws Are Subject To And Survive Nonpublic Forum Scrutiny.

The Supreme Court has held that restrictions on speech in nonpublic fora are subject to "a much more limited review" than those that apply in traditional public fora. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). Hogarth does not argue that the Ballot Photography Provisions fail under this standard as the Supreme Court has defined it. And while she concedes that the Voting Enclosure Provision is subject to nonpublic forum review, she argues solely that the statutory guardrails are insufficiently binding on election officials. She then argues that the Fourth Circuit imposes a more demanding nonpublic forum test than the Supreme Court mandates, and that the challenged laws fail that stricter scrutiny.

Hogarth is mistaken on each point. The laws survive nonpublic forum scrutiny, and Hogarth's attempts to escape that deferential review fail.

### A. The challenged laws reasonably serve permissible government ends.

Speech restrictions in nonpublic fora survive if they do not "discriminate[] on the basis of viewpoint" and are "reasonable in light of the purpose served by the forum." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 13 (2018) (cleaned up). To be reasonable, the State's objectives need be only "permissible," *id.*, and its chosen means consistent with common sense, *United States v. Kokinda*, 497 U.S. 720, 734-35 (1990).

The challenged laws "meet this deferential test." *Griffin v. Dep't of Veterans Affs.*, 274 F.3d 818, 822 (4th Cir. 2001). There is no dispute that the Voting Enclosure Provision and Ballot Photography Provisions are viewpoint neutral. Nor is there any dispute that "preserving the privacy of other voters, avoiding delays and distractions at the polls, preventing vote buying, and preventing voter intimidation," *Crookston v. Johnson*, 841 F.3d 396, 400 (6th Cir. 2016), are permissible ends. *See Mansky*, 585 U.S. at 15-16; *Burson*, 504 U.S. at 199. As shown below, the challenged laws are reasonable means to achieve those ends.

#### 1. The Voting Enclosure Provision and Ballot Photography Provisions as applied to in-person voting prevent delay and disorder.

Prohibiting photographs of marked ballots and requiring permission for selfies in the voting enclosure reasonably preserves "the privacy of other voters" and avoids "delays and distractions." *Crookston*, 841 F.3d at 400. "Allowing each voter to pose with and photograph a completed ballot would inevitably lead to delays and disorganization." *Oettle v. Guthrie*, 189 N.E.3d 22, 28 (Ill. App. Ct. 2020). These interests alone suffice to uphold (1) the Ballot Photography Provisions as applied to in-person voting and (2) the Voting Enclosure Provision in its entirety, as it applies nowhere else.

Preventing delay is "undoubtedly an important state interest." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 720 (4th Cir. 2016). "Common sense teaches that for many voter-photographers, taking a ballot selfie will … require multiple photographs to capture their ballot along with themselves in different poses, or repeated photographs where the original was inadequate due to deficient lighting, disheveled hair, or misplaced accessories." *Silberberg v. Bd. of Elections of N.Y.*, 272 F. Supp. 3d 454, 480 (S.D.N.Y. 2017). Other voters will have to

wait as ballot-selfie takers "struggle to activate, and then use, the camera functionality," *id.*, and then "try to capture the marked ballot and face in one frame—all while trying to catch the perfect smile," *Crookston*, 841 F.3d at 400. As this Court has recognized, "[l]ong election lines may frustrate voters attempting to exercise their right to vote." *Alcorn*, 826 F.3d at 720. Allowing ballot selfies can thus "suppress voter turnout." *Silberberg*, 272 F. Supp. 3d at 480.

The challenged laws also preserve order in the polling place. In *Mansky*, the Supreme Court held that Minnesota's ban on political insignia inside the polling place furthered the permissible objective of preserving "an island of calm in which voters can peacefully contemplate their choices." *Mansky,* 585 U.S. at 15-16 (cleaned up). If states can "prohibit certain apparel" in the polling place "so that voters may focus on the important decisions immediately at hand," *id.* at 16, then states can certainly prohibit or require permission for actively taking photographs. The risks are obvious. Ballot-selfie takers might unintentionally include an unwilling voter or poll worker in the frame. Or they might accidentally "compromise the secrecy of another's ballot." *Crookston*, 841 F.3d at 399. The mere risk of such an invasion of

privacy would "distract other voters." *Id.* And voters who see someone photographing a marked ballot cannot know if their intentions are corrupt, leading to still further disruption.

Absent the challenged laws, election officials would have to "monitor the length of time it takes voters to take photographs" and stand vigilant to "prevent inadvertent photographs" of other voters and their ballots. *Silberberg*, 272 F. Supp. 3d at 480. Setting "poll workers, already responsible for numerous tasks on Election Day," to that additional chore is "unreasonable," and achieving those goals would be "virtually impossible." *Id.* The First Amendment does not require "administratively unmanageable" policies. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*, 473 U.S. 788, 809 (1985). Moreover, "forc[ing] a poll worker to intervene" would disturb voters. *Crookston*, 841 F.3d at 399. Even under "narrow-tailoring analysis, the administrability and evenhandedness of a bright-line rule may outweigh its relative breadth." *Hebb v. City of Asheville*, 145 F.4th 421, 437 (4th Cir. 2025).

It is no answer that some voters could, in certain circumstances, take a ballot-selfie quickly and without intrusion. First, when there is no risk of delay or disorder, permission to take a selfie (without a

marked ballot) will be granted. *See infra* Section I.B. Second, "justifications for restrictions should not be measured by the disorder that would result from granting an exemption solely to" one person. *Griffin*, 274 F.3d at 823 (cleaned up). "For each extra minute that a voter spends" snapping selfies "in the voting booth, dozens or more voters may spend another minute in line. This all adds up." *Alcorn*, 826 F.3d at 720. "[M]any individuals taking even a marginally increased time to vote can combine to cause substantially increased wait times." *Silberberg*, 272 F. Supp. 3d at 480.

Hogarth principally contends that the Court should strike down these laws because they do not ban *all* photography in the voting enclosure. Br. 45, 47. Such a rule would create "a disincentive for the Government to dedicate its property to any speech activities at all." *Kokinda*, 497 U.S. at 733. Speech is far more restricted under other states' laws that entirely prohibit photography within or near a polling place. *See supra* at 6. These *more* burdensome laws are not somehow *safer* from First Amendment challenge. That is why even intermediate scrutiny involves no "freestanding underinclusiveness limitation." *TikTok Inc. v. Garland*, 604 U.S. 56, 76 (2025) (cleaned up).

In any event, there is no meaningful underinclusiveness here. Voters cannot photograph their marked ballots, themselves, or other voters. That leaves little of interest. This case is thus not comparable to *The News & Observer Publishing Co. v. Raleigh-Durham Airport Authority*, where the State banned newsracks in airports even though "numerous free-standing objects inside the terminals" obviously threatened the same supposed harm of congestion. 597 F.3d 570, 580-81 (4th Cir. 2010). The State's interest in running efficient and orderly polling places is not fatally undermined by a few hypothetical voters who may for some reason want to photograph something other than their marked ballots, themselves, or other voters.

**2. The Ballot Photography Provisions deter vote buying and voter coercion.**

Banning photographs of marked ballots also reasonably furthers the State's interests in "preventing vote buying[] and preventing voter intimidation," *Crookston*, 841 F.3d at 400, as well as mitigating "more subtle forms [of] coercion," *Silberberg*, 272 F. Supp. 3d at 473, and "protect[ing] public confidence in the integrity and legitimacy of representative government," *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (plurality) (cleaned up). The Supreme Court in

*Burson* detailed the historical justification for the secret ballot and upheld a more burdensome law under a more stringent standard. 504 U.S. at 199-211. *Burson* resolves this case.

**a. History confirms that the secret ballot serves as a necessary deterrent.**

The Supreme Court in *Burson* upheld a Tennessee law imposing a 100-foot campaign-free zone around polling places. *Id.* at 211. The Court held that "the evolution of election reform, both in this country and abroad, demonstrates the necessity of restricted areas in or around polling places," *id.* at 200, to "prevent[] voter intimidation and election fraud" by preserving the "secret ballot," *id.* at 206.[3]

"During the colonial period, many government officials were elected by the *viva voce* method or by the showing of hands.... The opportunities that the *viva voce* system gave for bribery and intimidation gradually led to its repeal." *Id.* at 200. But the continued "failure of the law to secure secrecy opened the door to bribery and intimidation." *Id.* at 200-01. "[P]olitical parties began to produce their

---

[3] Four Justices upheld the law under a version of strict scrutiny discussed *infra* Section II.A. Justice Scalia concurred, relying on the same substantive analysis, but under the nonpublic forum standard. *See Burson*, 504 U.S. at 214-16 (Scalia, J., concurring).

own ballots," which "were often printed with flamboyant colors, distinctive designs, and emblems so that they could be recognized at a distance." *Id.* at 200. "Abuse of these unofficial paper ballots was rampant," and "votes could be freely bought or coerced." *John Doe No. 1 v. Reed*, 561 U.S. 186, 226 (2010) (Scalia, J., concurring).

According to an 1892 study, some "sixteen percent of Connecticut voters [were] up for sale." John C. Fortier & Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. Reform 483, 489 (2003). Employees who "voted against their employers' wishes frequently lost their jobs." *Burson*, 504 U.S. at 201 n.7 (cleaned up). "Thugs forced voters at the polls to reveal their voting ticket, then beat or shot them and forcibly tore up the opposing party's ticket if they refused to vote as ordered." *George v. Mun. Election Comm'n of City of Charleston*, 516 S.E.2d 206, 209 (S.C. 1999).

This occurred despite laws prohibiting bribery and coercion. *See* John H. Wigmore, The Australian Ballot System as Embodied in the Legislation of Various Countries, 50-51 (1889) ("Wigmore") (such statutes were "practically of no effect")[4]; *Silberberg*, 272 F. Supp. 3d at

---

4 https://archive.org/details/australianballo03wigmgoog

472 ("It was in fact the failure of such laws that prompted … ballot reforms in the first place."). North Carolina, for example, has outlawed vote buying since 1777. *See Duke v. Asbee*, 33 N.C. 112, 114 (1850).

Moreover, not all pressures that affected the vote were (or are) illegal. As one leading contemporary law professor noted, the secret ballot protects against not only "violence and intimidation," but also "more subtle and perhaps more pernicious coercion of every sort," such as "the fear of ridicule and dislike, or of social or commercial injury." Wigmore at 52-53. For example, while an 1880 Senate Committee investigation found no "unlawful combination to coerce votes," it nonetheless concluded that many employees voted "against their own deliberate convictions" because "those in charge could see" how votes were cast. S. Rep. No. 497, 46th Cong., 2d Sess., 2-5 (1880).[5]

States responded by adopting secret ballot laws to "protect the weak and dependent against intimidation and coercion" and "diminish the growing evil of bribery by removing the knowledge of whether it had been successful." *Burson*, 504 U.S. at 203. A person is unlikely to

---

[5] https://www.govinfo.gov/app/details/serialset-01897_00_00-011-0497-0000

"enter into an agreement with a voter to pay for his vote" or "use threats to influence a voter to vote in a given way" without some "means of ascertaining the way the voter casts his ballot." *Evans v. Reiser*, 2 P.2d 615, 625 (Utah 1931); *see also* Wigmore at 52 (describing this point as "obvious," "trite and well-understood").

"The success achieved through these reforms was immediately noticed and widely praised." *Burson*, 504 U.S. at 204; *see also id.* (quoting 1880s commentary that "[w]e have secured secrecy; and intimidation by employers, party bosses, police officers, saloonkeepers and others has come to an end"). "With the rise of the secret ballot and the concomitant increase in the cost of verifying that vote buyers were getting what they paid for, vote buying almost certainly has declined." Richard L. Hasen, *Vote Buying*, 88 Cal. L. Rev. 1323, 1328 (2000) ("*Vote Buying*"). Many other countries had the same experience. *See* Wigmore at 3-23; *Burson*, 504 U.S. at 202-03.

"Against that historical backdrop, the [*Burson*] plurality and Justice Scalia upheld Tennessee's determination, supported by overwhelming consensus among the States and 'common sense,' that a campaign-free zone outside the polls was 'necessary' to secure the

advantages of the secret ballot and protect the right to vote." *Mansky*, 585 U.S. at 13-14 (quoting *Burson*, 504 U.S. at 206-08). The same holds true for prohibiting taking and sharing photographs of marked ballots, particularly under the more forgiving nonpublic forum standard.

**b. These threats remain today and are difficult to detect.**

Elections in North Carolina are secure. That is due in part to the Ballot Photography Provisions, which directly address risks of vote buying and intimidation. "As with many illegal practices, vote buying is difficult to detect because parties engaging in it do so surreptitiously." *Vote Buying* at 1328. So too for voter intimidation. An employee, tenant, or spouse coerced into voting a particular way on pain of being fired, evicted, or abused is unlikely to report those threats.

And certainly "more subtle forms [of] coercion" continue. *Silberberg*, 272 F. Supp. 3d at 473. Statutes "criminalizing the purchasing of votes and voter intimidation ... do not address the potential societal influences perpetuated through exposure to public opinion." *Oettle*, 189 N.E.3d at 28. Some voters who buck their families, peers, "employers, unions, political groups, or religious organizations" would face "disapprobation" or "the possibility of being

shunned." *Silberberg*, 272 F. Supp. 3d at 474. If those voters could be pressured "to produce photographs" of their marked ballots, then some would not vote their conscience. *Id.*

Despite the difficulty of detection, "plenty of cases" confirm that vote buying is no mere "relic of a bygone electoral era." *Crookston*, 841 F.3d at 400. For example, leading up to "the November 2002 general election in Caldwell County, North Carolina," five individuals "engaged in a widespread scheme to buy votes" for a candidate for sheriff. *United States v. Shatley*, 448 F.3d 264, 266 (4th Cir. 2006). This misconduct "was sufficiently serious to cast doubt on the apparent results of the election." *In re Caldwell Cnty. Election Protests*, 600 S.E.2d 901, at *2 (N.C. Ct. App. 2004) (cleaned up). A federal investigation into vote buying in North Carolina in the 1980s netted more than 40 convictions, "including three sheriffs, three deputies, a local magistrate, a school board member and assorted voting officials." William E. Schmidt, *No More Selling of Votes?*, N.Y. Times, Oct. 15, 1986, at A16; *see also* Dep't of Just., Report to Congress on the Activities and Operations of the Public Integrity Section for 1986 at 21-22 (1987) (describing "Project

Westvote")[6]; *United States v. McLean*, 808 F.2d 1044 (4th Cir. 1987) (appealing one such conviction).

Other examples from across the country abound. *See United States v. Smith*, No. CR 21-152, 2023 WL 2043307, at *1 (E.D. La. Feb. 16, 2023); *United States v. Raia*, 993 F.3d 185, 187-88 (3d Cir. 2021); *United States v. Smilowitz*, 974 F.3d 155, 156-58 (2d Cir. 2020); *United States v. Risner*, 737 F. App'x 751, 753-54 (6th Cir. 2018); *United States v. Robinson*, 813 F.3d 251, 254 (6th Cir. 2016); *United States v. Turner*, 536 F. App'x. 614, 615 (6th Cir. 2013); *United States v. Adams*, 722 F.3d 788, 798-99 (6th Cir. 2013); *United States v. Young*, 516 F. App'x 599, 600-01 (6th Cir. 2013); *United States v. Jones*, 408 F. App'x 949, 950 (6th Cir. 2011); *United States v. Shrout*, 298 F. App'x 479, 480-81 (6th Cir. 2008); *United States v. Thomas*, 510 F.3d 714, 717-20 (7th Cir. 2007); *United States v. Smith*, 139 F. App'x 681, 682-84 (6th Cir. 2005); *United States v. Slone*, 411 F.3d 643, 644-45 (6th Cir. 2005); *United States v. Madden*, 403 F.3d 347, 348 (6th Cir. 2005); *United States v. McCranie*, 169 F.3d 723, 724-26 (11th Cir. 1999); *United States v. Odom*, 858 F.2d 664, 665 (11th Cir. 1988); *United States v. Garcia*, 719

---

6 www.justice.gov/criminal/criminal-pin/file/1340591/dl?inline

F.2d 99, 100 (5th Cir. 1983); *United States v. Carmichael*, 685 F.2d 903, 906-08 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 870-71 (5th Cir. 1982).

These cases led to readily available written opinions. Other prosecutions, of course, did not or have not yet. *See, e.g.*, Indictment, *United States v. Ortiz-Vazquez*, 3:24-cr-456, at 9 (D.P.R. Dec. 12, 2024) (alleging vote buying and coercion among prison gangs); Dep't of Just., Press Release No. 14-1336, (Dec. 1, 2014) (discussing six guilty pleas to vote-buying charges).[7]

The subset of cases with written opinions confirms the obvious point that vote buying and intimidation schemes require proof to be effective. Some vote buyers and extortionists fill out or review others' absentee ballots. *See, e.g.*, *Robinson*, 813 F.3d at 254, 257-58 (describing "campaign of bribery, coercion, and intimidation" that included filling out voters' absentee ballots, accompanied by threats of eviction); *Carmichael*, 685 F.2d at 907; *Raia*, 993 F.3d at 188; *Adams*, 722 F.3d at 799-99. Others accompany voters into the booth, telling poll

[7] https://www.justice.gov/archives/opa/pr/campaign-manager-pleads-guilty-conspiracy-buy-votes-donna-texas-school-board-election

workers the voter needs assistance. *See Smith*, 139 F. App'x at 683; *Shrout*, 298 F. App'x at 481; *Adams*, 722 F.3d at 799. And other conspiracies include election officials who can see whether "voters marked their ballots as they had been paid to do." *McLean*, 808 F.2d at 1045; *see also Risner*, 737 F. App'x at 754; *Adams*, 722 F.3d at 799.

These schemes would be far easier to accomplish, and detection far less likely, if proving that votes were cast consistent with vote buyers' and extortionists' demands was as easy as pulling out a cell phone and snapping a picture. The secret ballot continues to serve as a critical deterrent. And the ban on taking and sharing photographs of marked ballots preserves the secret ballot.[8]

### 3. The Ballot Photography Provisions protect the public trust.

North Carolinians rightly trust in the integrity of their elections. But the possibility of counting bought-for or extorted votes would

---

[8] Hogarth cannot show overbreadth with "fanciful" hypothetical prosecutions, *United States v. Arthur*, 160 F.4th 597, 606 (4th Cir. 2025), such as those described on page 36 of her brief. Moreover, fairly read, Section 163-274(b)(1) criminalizes telling others of a vote only when that knowledge comes from illegal access to voting records; it does not "bar voters from even *telling* anyone how they voted if they have a digital image of their own voted ballot on their phone." Br. 36.

"erode[] public confidence that the election results reflect the people's will." *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 78 (2026). *See, e.g.*, *Burson*, 504 U.S. at 201 n.6 (quoting 1880s commentary that "[m]any electors, aware that the corrupt element was large enough to be able to turn the election, held aloof altogether"). North Carolina's secret ballot law was passed to ensure that elections were "not only fair to everybody, but [also so] everybody would know that they were fair." Oliver Max Gardner, *Public Papers of Oliver Max Gardner: Governor of North Carolina, 1929-1933*, 7 (Edwin Maurice Gill ed. 1937).[9]

Vote buying and coercion is rare. But "there is no doubt that it occurs" and that it would occur far more often but for the secret ballot. *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 602 (4th Cir. 2016) (discussing voter fraud). Banning an obvious way for the ill-intentioned to confirm votes reasonably preserves "confidence in the integrity of elections." *Id.* at 607. That is more than enough to justify the Ballot Photography Provisions under the nonpublic forum test.

---

[9] https://digital.ncdcr.gov/Documents/Detail/public-papers-and-letters-of-oliver-max-gardner-governor-of-north-carolina-1929-1933/4020462?item=4023881 (PDF page 77).

### B. The Voting Enclosure Provision is subject to objective, workable standards.

Hogarth argues that the Voting Enclosure Provision is unreasonable under the nonpublic forum standard because it is not "guided by objective, workable standards." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 199 (4th Cir. 2022) (quoting *Mansky*, 585 U.S. at 21). She is mistaken.

North Carolina law enumerates the "[p]owers and duties of chief judges and judges of election." N.C. Gen. Stat. § 163-47. Relevant here, the "chief judges and judges of election shall conduct the primaries and elections within their respective precincts fairly and impartially, and they shall enforce peace and good order in and about the place of … voting." *Id.* § 163-47(a). To maintain "peace and good order," chief judges "shall especially keep open and unobstructed … the place of ... voting," "prevent and stop ... attempts to obstruct, intimidate, or interfere" with voters, and prevent "disorder." *Id.* § 163-48. Those bedrock rules control at all times, including when chief judges decide whether to grant permission to take a selfie in the voting booth.

Hogarth concedes the standards in Sections 163-47(a) and 163-48 are objective and workable. Br. 41. She argues, however, that the law

nonetheless fails First Amendment scrutiny because it "does not limit elections officials' approval power to *only* those reasons." Br. 41 (emphasis added). But election officials have only the authority granted by statute. When executing their specific statutory tasks, chief judges must abide by their overarching statutory mandates. They thus have the "[p]ower[]" to deny a selfie request only if they do so "fairly and impartially" and to help maintain "peace and good order." N.C. Gen. Stat. § 163-47(a). When there is no risk of "disorder" or "obstruct[ion]," *id.* § 163-48—for example, because there is no line and the selfie-taker can be positioned without threatening others' privacy—the chief judge does not have statutory authority to deny permission. If there were any ambiguity, the Court should adopt this narrowing construction to avoid constitutional doubts. *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).

Hogarth's demand for more explicit specificity is unrealistic. The Supreme Court rejected a similarly formalist argument in *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002), where the plaintiff challenged a statute because it identified the "grounds on which the Park District 'may' deny a permit, rather than grounds on which it *must* do so." *Id.* at 324. The Court upheld the law. It held that the possibility of arbitrary

denials "must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." *Id.* at 325. So too here.

### C. Hogarth's arguments against nonpublic forum scrutiny as to the Ballot Photography Provisions fail.

Hogarth does not argue that the Ballot Photography Provisions fail under the Supreme Court's nonpublic forum precedent. She instead argues that the Ballot Photography Provisions are subject to strict scrutiny because they "apply *everywhere* in North Carolina, not just official polling places." Br. 22. That argument fails because the ballot itself is a nonpublic forum. *Silberberg*, 272 F. Supp. 3d at 477-78; *Oettle*, 189 N.E.3d at 26. At minimum, the law as applied to in-person voting is subject to nonpublic forum scrutiny.

#### 1. Nonpublic forum scrutiny applies because the ballot is itself a nonpublic forum.

##### a. Restrictions on photographs of nonpublic fora receive nonpublic forum scrutiny.

When a plaintiff "seek[s] access to a particular means of communication" that is itself a nonpublic forum, the nonpublic forum standard applies regardless of the "physical situs" where the speaker stands. *Cornelius*, 473 U.S. at 801; *see also Page v. Lexington Cnty.*

*Sch. Dist. One*, 531 F.3d 275, 284-86 (4th Cir. 2008). A means of communication may be "a forum more in a metaphysical than in a spatial or geographic sense, but the same principles are applicable." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). It does not matter that a person might access nonpublic means of communication from a public place.

Restrictions on photographs of nonpublic information as a means of communication are therefore subject to nonpublic forum review. Consider the statute making it unlawful to "make any photograph, sketch, picture, drawing, map, or graphical representation" of classified "military and naval installations or equipment." 18 U.S.C. § 795. A court would not subject that law to strict scrutiny, requiring a concretely substantiated national security concern for every inch of a military base simply because a person might sketch a blueprint while sitting at "the kitchen table" or "in the park." Br. 22. The law would be subject to nonpublic forum analysis.

Courts have also upheld bans on cameras in the courtroom in part because they "serve[] a legitimate security need," *United States v. Gileno*, 350 F. Supp. 3d 910, 918 (C.D. Cal. 2018), and because

"prohibiting the recording of jurors and witnesses will alleviate any concerns about witness and juror intimidation," *McKay v. Federspiel*, No. 14-CV-10252, 2014 WL 7013574, at *6, 9-10 (E.D. Mich. Dec. 11, 2014). Standing on a sidewalk with a telephoto lens and parabolic microphone would not change this aspect of the analysis.

Many laws also prohibit disseminating nonpublic government information. *See* 18 U.S.C. § 797 (photographs of classified military installations); 18 U.S.C. § 798 (classified information); 18 U.S.C. § 793 (classified national security materials); 18 U.S.C. § 641 (any "thing of value of the United States"); 18 U.S.C. § 2511(1)(c) (wiretap contents). An illicit photographer would not get a free pass to strict scrutiny by posting this nonpublic information "to social media from the car." Br. 22. These statutes are not "subject to lesser scrutiny where such a display or disclosure" of nonpublic information "occurs in a public forum." *Silberberg*, 272 F. Supp. 3d at 477.

It is separately difficult to fathom how a ban on disseminating certain photographs could fail constitutional scrutiny when the State can permissibly ban taking those photographs in the first place because of harm that would arise from dissemination. As the court held in

*Silberberg*, nonpublic forum scrutiny applies to laws that prohibit sharing pictures of in-person ballots because "the first step"—taking the picture—"must take place in a non-public forum." *Id.* Indeed, taking pictures only implicates the First Amendment when the photographs are meant to be shared. *PETA v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir. 2023).

**b. The ballot is a nonpublic forum.**

In *Timmons v. Twin Cities Area New Party*, the Supreme Court upheld a "fusion" ban prohibiting candidates from identifying with more than one party on the ballot. 520 U.S. 351, 369-70 (1997). The Court rejected a political party's asserted "right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate." *Id.* at 363. "Ballots serve primarily to elect candidates, not as forums for political expression." *Id.* The Supreme Court has also rejected the asserted constitutional right to write in candidates because "the function of the election process is to winnow out and finally reject all but the chosen candidates," not to serve "a more generalized expressive function." *Burdick v. Takushi*, 504 U.S. 428, 438 (1992) (cleaned up). Applying this precedent, the Second

Circuit recently held that a nominating petition is a nonpublic forum because it, "like the ballot, is a state-controlled document" intended "to provide prospective independent nominees … access to the ballot." *Walden v. Kosinski*, 153 F.4th 118, 139 (2d Cir. 2025).

Ballots in North Carolina are "used by the state for the sole purpose of allowing the voter to record their vote in a form in which it can be tabulated by the appropriate election officials." *Silberberg*, 272 F. Supp. 3d at 478. North Carolina exercises extensive control over ballots to ensure they serve that purpose. *See generally* N.C. Gen. Stat. §§ 163-165 to 163-258. "[T]he Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Cornelius*, 473 U.S. at 800 (cleaned up). Taking and sharing photographs of marked ballots is anathema to free elections because it facilitates vote buying and coercion and threatens public trust. *See supra* Section I.A.2-3.

### 2. The Ballot Photography Provisions as applied to in-person voting operate in a nonpublic forum.

Hogarth's argument for strict scrutiny also fails as applied to in-person voting because the polling place is a nonpublic forum. *Mansky*, 585 U.S. at 12. The fact that the Ballot Photography Provisions also

prohibit taking photographs of absentee ballots and sharing pictures of marked ballots elsewhere does not change the analysis with respect to the polling place. Hogarth cites no case holding that laws enforced in multiple fora are subject to strict scrutiny everywhere.

Indeed, the case law is to the contrary. In *United States v. Grace*, the Supreme Court addressed a law restricting speech "in the Supreme Court Building or grounds," including the perimeter sidewalks where the plaintiffs wanted to protest. 461 U.S. 171, 174-75 (1983). The Court recognized that the building and its immediate surroundings were likely nonpublic fora, *id.* at 178, but held that the sidewalks were traditional public fora, applied strict scrutiny, and struck down the law as applied to the sidewalks, *id.* at 180-84. Following the Supreme Court's lead, the D.C. Circuit later upheld the same law as applied to the building's immediate surroundings under the nonpublic forum standard. *Hodge v. Talkin*, 799 F.3d 1145, 1150 (D.C. Cir. 2015).

Thus, when the same restriction applies in easily distinguishable fora, courts apply the appropriate scrutiny for each forum. Enforcement of the Ballot Photography Provisions during in-person voting is therefore subject to the nonpublic forum standard. And while not

limited to in-person voting, the State's "interests in preventing bribed and forced votes are connected to maintaining the integrity of the voting booth." JA13. After all, the polling place's purpose is to allow exercise of the "right to vote freely and effectively." *Burson*, 504 U.S. at 208.

### D. The Fourth Circuit does not require a stricter means-end fit than the Supreme Court has mandated.

Hogarth also attempts to escape nonpublic forum review by arguing that the Fourth Circuit, contrary to the Supreme Court's instruction, requires states to adduce precisely on-point evidentiary support or rely solely on the least restrictive means of direct prohibitions. Br. 43-47. This Court has done no such thing. This Court merely restated the Supreme Court's test when it recognized that speech restrictions in nonpublic fora require "more than a rational basis" but less than "strict scrutiny," making it "akin to some form of so-called intermediate scrutiny." *White Coat*, 35 F.4th at 198. It did not announce a separate, stricter standard.

The decision in *Griffin* is illustrative. There, this Court held that the VA reasonably denied a request to fly a Confederate flag in a cemetery "in light of the VA's desire to preserve the tranquility of national cemeteries." 274 F.3d at 823-24. The Court held that the

"government need not prove disruptions will occur." *Id.* (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,* 460 U.S. 37, 52 n.12 (1983)). Indeed, it did not matter that the flag "had flown for several years ... without incident." *Id.* The VA could nonetheless "reasonably believe that the Confederate flag *could* cause controversy and that such controversy *could* undermine the VA's goal." *Id.* This Court repeated the point three years later, holding that the VA was not required to "demonstrate" how a planned speech would "threaten the cemetery's intended use" because "the Supreme Court has said that no such determination is necessary regarding non-public forums." *Griffin v. Dep't of Veterans Affs.*, 106 F. App'x 816, 820 (4th Cir. 2004).

Hogarth relies on *News & Observer*, 597 F.3d 570, and *Multimedia Publishing Co. v. Greenville-Spartanburg Airport District*, 991 F.2d 154 (4th Cir. 1993). Far from creating a separate, more demanding test, those cases explicitly confirm that (1) regulations in nonpublic fora "need not be the most reasonable" limitation, *News & Observer*, 597 F.3d at 577 (quoting *Multimedia*, 991 F.2d at 159); and (2) the State need not adduce "specific factual evidence," but can rely on "common sense and logic," *Multimedia*, 991 F.2d at 160; *see also News &*

*Observer*, 597 F.3d at 578. This Court struck down the laws at issue in those cases because "nothing in common sense or logic" supported the asserted interests, and in fact "common sense allay[ed]" the identified concerns. *Multimedia*, 991 F.2d at 161-62; *see also News & Observer*, 597 F.3d at 579-81. Not so here.

There is no daylight between the Supreme Court's test and the Fourth Circuit's. If there were, then the Supreme Court's test would control. Regardless, the challenged laws survive under the balancing test that Hogarth describes. *See supra* Section I.A.

## II. The Ballot Photography Provisions Are Subject To And Survive The Flexible Review For Voting Regulations.

Hogarth does not argue that the Voting Enclosure Provision fails for any other reason or is subject to any more demanding standard of review. The Court should affirm as to that claim. As to the Ballot Photography Provisions, the Court should affirm even if it does not apply nonpublic forum review. States have a uniquely "compelling interest in securing the right to vote freely and effectively." *Burson*, 504 U.S. at 208. Subjecting "every voting regulation to strict scrutiny … would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Courts

therefore apply "more flexible standard[s]" in this context. *Id.* at 434. The Ballot Photography Provisions survive those flexible standards.

### A. Alternatively, the Ballot Photography Provisions are subject to and survive strict scrutiny under *Burson*.

If heightened scrutiny applies, it is the form laid out in *Burson*, under which laws survive if they are "reasonable and do[] not *significantly impinge* on constitutionally protected rights." *Burson*, 504 U.S. at 209 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986)). The Ballot Photography Provisions pass that test.

#### 1. Modified strict scrutiny applies under *Burson*.

*Burson*'s "modified" standard applies when the exercise of a "First Amendment right threatens to interfere with the act of voting itself." *Burson*, 504 U.S. at 209 n.11. In *Burson*, partisan speech near a polling place "conflict[ed] with" the "right to cast a ballot in an election free from the taint of intimidation and fraud." *Id.* at 211. That was in part because proximity threatened "ballot secrecy." *Id.* at 207. The Ballot Photography Provisions likewise seek to "cure electoral abuses," *id.*, by preventing unauthorized persons from seeing how votes are cast. This case and *Burson* thus present the same "difficult reconciliation: the accommodation of the right to engage in political discourse with the

right to vote—a right at the heart of our democracy." *Id.* at 198. The same test therefore applies.

The First Circuit erroneously held that *Burson* applies only to "the protection of physical election spaces." *Rideout v. Gardner*, 838 F.3d 65, 73 (1st Cir. 2016). To the contrary, *Burson* expressly applies whenever a "First Amendment right threatens to interfere with the act of voting itself," including by facilitating "election fraud." *Burson*, 504 U.S. at 209 & n.11. Underscoring the point, *Burson* relied on *Munro*, *see id.*, which upheld a law requiring a certain threshold of support for primary candidates to advance to the general election, *Munro*, 479 U.S. at 190. And *Munro* relied on cases addressing "voter confusion, ballot overcrowding, or the presence of frivolous candidacies." *Munro*, 479 U.S. at 194-95 (citing *Jenness v. Fortson*, 403 U.S. 431 (1971); *American Party of Texas v. White*, 415 U.S. 767 (1974); and *Storer v. Brown*, 415 U.S. 724, 730 (1974)). These cases have nothing to do with protecting "physical election spaces." *Rideout*, 838 F.3d at 73.

#### 2. Prohibiting taking and sharing photographs of marked ballots is reasonable.

The Court in *Burson* held that "the link between ballot secrecy and some restricted zone surrounding the voting area is ... common

sense. The only way to preserve the secrecy of the ballot is to limit access to the area around the voter." 504 U.S. at 207-08. The link between ballot secrecy and prohibiting taking and sharing photographs of marked ballots is equally obvious.

Hogarth's central contention—that the State must either offer examples of vote buying or coercion specifically involving ballot selfies or rely solely on direct prohibitions—fails under *Burson*. "[B]ecause a government has such a compelling interest in securing the right to vote freely and effectively, th[e] Court never has held a State 'to the burden of demonstrating empirically the objective effects [of] the voting regulation in question.'" *Id.* at 208 (quoting *Munro*, 479 U.S. at 195). Rather, states are "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro*, 479 U.S. at 195. Indeed, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).

That prophylactic approach is particularly appropriate here because the targeted wrongs are difficult to detect and prosecute.

"Intimidation and interference laws [fell] short" in *Burson* because they "deal with only the most blatant and specific attempts to impede elections," while more subtle efforts "are successful precisely because they are difficult to detect." *Burson*, 504 U.S. at 206-08. States were free to take prophylactic measures given the risk that without them "many acts of interference would go undetected." *Id.* at 207.

So too here. Laws "prohibiting vote buying and voter intimidation are unlikely to be a particularly effective means to combat these evils so long as the perpetrators may verify their target's votes." *Silberberg*, 272 F. Supp. 3d at 472. A law banning photographs of marked ballots only as part of a vote buying or coercion scheme would be impossible to enforce because poll workers cannot know a voter's motives. Moreover, employers, partners, family members, religious communities, unions, and peers could leverage ballot selfies to subtly pressure voters in legal ways. "These undetected or less than blatant acts may" affect how votes are cast. *Burson*, 504 U.S. at 207. "The state has a compelling interest in ensuring that citizens are allowed to vote their conscience. Secrecy in voting allows the voter to engage in the act of voting free from the judgement of others." *Silberberg*, 272 F. Supp. 3d at 474.

#### 3. The Ballot Photography Provisions do not significantly impinge First Amendment rights.

Finally, the Ballot Photography Provisions do not "significantly impinge" First Amendment rights. *Burson*, 504 U.S. at 209. There is no dispute that they are "politically neutral," which is "a principal factor in assessing the burden." *Fusaro v. Cogan*, 930 F.3d 241, 261 (4th Cir. 2019). That neutrality suggests the laws "impose[] only the most modest burdens." *Alcorn*, 826 F.3d at 717.

The Ballot Photography Provisions also leave open ample alternative channels of communication, as other First Amendment case law makes clear. Under the analogous time, place, and manner inquiry, the "available alternatives need not be the speaker's first or best choice or provide the same audience or impact for the speech." *Ross v. Early*, 746 F.3d 546, 559 (4th Cir. 2014) (cleaned up). "Rather, the relevant inquiry is simply whether the challenged regulation provides avenues for the more general dissemination of a message." *Id.* (cleaned up).

So too under the similar *Anderson-Burdick* inquiry. The fusion ban in *Timmons* did not severely burden speech because political parties could still "use the ballot to communicate information about [themselves] and [their] candidate to the voters, so long as that

candidate is not already someone else's candidate," and also "communicate ideas" by "campaign[ing] for, endors[ing], and vot[ing] for their preferred candidate." 520 U.S. at 363. Likewise, a ban on write-in voting did not severely burden speech because voters had other ways to ensure their preferred candidates appeared on the ballot, even though those ways all required either collecting numerous signatures or being a member of an established political party. *Burdick*, 504 U.S. at 435-36.

"A picture may be worth a thousand words, but social media users can (and do) post thousands of words about whom they vote for and why." *Crookston*, 841 F.3d at 400. Hogarth can communicate her desired messages in any number of ways, including "on billboards, in newsletters, [and] on the internet." *Fusaro*, 930 F.3d at 260; *see also Hebb*, 145 F.4th at 439 (upholding amplification prohibition that did "not prohibit unamplified speech, the distribution of written material, or the display of signs and placards" (cleaned up)). She can amplify her message with a photograph by seeking permission to take a selfie in the voting enclosure, and in that picture, she can point to her candidate on an unmarked or sample ballot. And she can post or publish that picture wherever she likes, along with whatever commentary she likes.

Hogarth would prefer a photograph of her marked ballot because it proves "for whom and/or what [she] actually voted." Br. 1. "But other forms of visual display of candidate support may be as compelling or nearly as compelling without the attendant dangers" discussed above. *Silberberg*, 272 F. Supp. 3d at 478. And the "inquiry does not rise or fall on the efficacy of a single medium of expression," nor does the First Amendment afford "special protection to a speaker's favored ... mode of communication." *Ross*, 746 F.3d at 559 (cleaned up). A perfect substitute is not required.

In short, the Ballot Photography Provisions do not make it "excessively burdensome," *Crawford*, 553 U.S. at 202 (cleaned up), or "extremely difficult," *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995), to communicate the messages that Hogarth seeks to convey. The laws thus do not significantly impinge on Hogarth's First Amendment rights. They survive under *Burson*.

### B. Alternatively, the Ballot Photography Provisions are subject to and survive the *Anderson-Burdick* test.

Under the *Anderson-Burdick* test, "severe" restrictions on First Amendment rights are subject to strict scrutiny, while "the State's important regulatory interests are generally sufficient to justify" a

"reasonable, non-discriminatory restriction[]." *Fusaro*, 930 F.3d at 257 (quoting *Burdick*, 504 U.S. at 434). As shown, the Ballot Photography Provisions impose minimal burdens. *See supra* Section II.A.3. The State therefore need not "factually demonstrate the extent to which its interests make it necessary to burden the plaintiff's rights." *Wood v. Meadows*, 207 F.3d 708, 715-16 (4th Cir. 2000) (cleaned up). For example, in *Crawford* the Supreme Court held that preventing fraud and protecting voter confidence justified a voter identification law even though the "record contain[ed] no evidence of any such fraud" and Indiana "punish[ed] [voter fraud] as a felony." 553 U.S. at 194-95, 197. Like *Burson*, *Anderson-Burdick* does not require the selfie-specific evidence that Hogarth demands. The State's interests, *see supra* Section I.A, more than justify the minimal burdens imposed.

Hogarth therefore does not argue that the Ballot Photography Provisions fail under *Anderson-Burdick*. She instead argues that *Anderson-Burdick* applies only to regulations governing the "mechanics of the electoral process," not to either "'pure' speech" or "content based" regulations. Br. 25 n.7. Hogarth misstates the test, and in any event *Anderson-Burdick* applies under the test as she describes it.

*First*, the Ballot Photography Provisions regulate the mechanics of the electoral process, not pure speech. *Anderson-Burdick* applies to restrictions on speech that is entwined with "the voting process itself." *McIntyre*, 514 U.S. at 344. In *Burdick*, for example, the Court did not apply strict scrutiny to a law prohibiting write-in votes because that law "channel[ed] expressive activity at the polls" to "maintain the integrity of the democratic system." 504 U.S. at 438, 441. Laws limiting the names of political parties and slogans on the ballot likewise regulate election mechanics, not pure speech. *Walden*, 153 F.4th at 136; *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 144-45 (3d Cir. 2022). And the Fifth Circuit applied *Anderson-Burdick* to a law that prohibited certain conversations "intended to deliver votes for a specific candidate or measure" when they occur "in the physical presence of an official ballot or a ballot voted by mail." *La Union del Pueblo Entero v. Abbott*, 167 F.4th 743, 753, 760-61 (5th Cir. 2026). "The fact that the statute applies only in direct physical proximity to a voter as he or she fills out an official ballot necessitates *Anderson/Burdick* review." *Id.* at 761.

The Ballot Photography Provisions do not regulate pure speech because they are directly tied to the act of voting. Specifically, the ban

on taking photographs of marked ballots limits what voters can do with their ballots after marking them and before returning them to be counted. The Ballot Photography Provisions are thus distinct from the sweeping ban on anonymous campaign literature in *McIntyre*, which had nothing to do with the mechanics of voting. 514 U.S. at 345-46.[10]

*Second*, *Anderson-Burdick* is not limited to the mechanics of voting. It also applies where (1) a claim requires "resolv[ing] the tension between the deference that the courts owe to legislatures in areas meriting careful regulation and the need to protect 'fundamental' First Amendment rights," and (2) the challenged laws are "a step removed from direct acts of communication." *Fusaro*, 930 F.3d at 258. *Fusaro* recognized that "the *Anderson-Burdick* test has generally been applied to claims concerning ballot access," but nonetheless "borrow[ed] that standard" to address restrictions on access to voter lists. *Id.*

---

10 As applied to ballot selfies—where a voter takes and shares a picture of their own marked ballot—the laws prohibiting sharing such pictures cannot be analytically separated from the law prohibiting taking them: taking a ballot selfie is a prerequisite for sharing a ballot selfie. Both laws thus govern the mechanics of voting. And even if the prohibition as applied to sharing ballot-selfies governs pure speech, it necessarily survives under any tier of scrutiny because the ban on taking ballot-selfies survives. *See supra* at 32-33.

This case involves a similar balance between free speech and free elections. And the act of taking a picture is "a step removed" from speech. *Id.* Taking a picture is conduct, not speech (much less "pure speech"). Courts protect photography as if it were speech only when doing so "safeguard[s] the right to gather information *as a predicate* to speech." *PETA*, 60 F.4th at 829 (emphasis added).

*Finally*, as explained below in Section III.A.1, the Ballot Photography Provisions are content neutral. Even if they were not, whether a regulation is content based "bear[s] on the severity of the burden imposed"—it does not foreclose the *Anderson-Burdick* framework. *Mazo*, 54 F.4th at 147. The Court in *Fusaro* applied *Anderson-Burdick* despite recognizing that the challenged law included a "content-based distinction"—namely, lists of registered voters could be provided only for purposes "related to the electoral process." 930 F.3d at 263. That distinction did not warrant strict scrutiny because it was "politically neutral," thus "avoid[ing] the critical danger that the government might unduly influence 'competition in the marketplace of ideas.'" *Id.* (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983)). Hogarth cites *Kendall v. Balcerzak*, 650 F.3d 515 (4th Cir. 2011), but

there the Court did not apply strict scrutiny because the challenged laws "applied indiscriminately" and were not "targeted at the content or purpose of any particular speech." *Id.* at 526. The challenged laws here apply indiscriminately, regardless of the race, issue, or vote at issue. Strict scrutiny is thus inappropriate. The Ballot Photography Provisions survive under *Anderson-Burdick*.

## III. The Ballot Photography Provisions Survive Any Other Level Of Scrutiny

### A. The Ballot Photography Provisions are permissible, content-neutral restrictions.

Even if the Court sets aside the fact that the Ballot Photography Provisions apply in both nonpublic fora and the unique context of elections, it should still affirm because the laws are content neutral and survive intermediate scrutiny.

#### 1. The Ballot Photography Provisions are content neutral.

Content-based laws trigger heighted scrutiny because they "discriminate based on topic" and so "present the potential for becoming a means of suppressing a particular point of view." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 72 (2022) (cleaned up). That risk is not present when a person's liability "depends not on

what they say, but simply on where they say it." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (cleaned up). The Ballot Photography Provisions outlaw taking or sharing photographs of marked ballots regardless of race, issue, or candidate. They are "content-agnostic," *City of Austin*, 596 U.S. at 76, and subject to at most intermediate scrutiny.

Hogarth relies on *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). Br. 21-23. *Reed* struck down an ordinance imposing different limits on ideological, political, and temporary directional signs. 576 U.S. at 159-60. According to Hogarth, the ordinance in *Reed* was content based because enforcement "required differentiating based on what the signs contained," and enforcing the Ballot Photography Provisions similarly requires looking at the relevant picture to see if it includes a marked ballot. Br. 23. Hogarth cites cases relying on the same understanding of *Reed*. *See Indiana C.L. Union Found., Inc. v. Indiana Sec'y of State*, 229 F. Supp. 3d 817, 823 (S.D. Ind. 2017); *Rideout v. Gardner*, 123 F. Supp. 3d 218, 228-29 (D.N.H. 2015); *Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370, 1386 (N.D. Ga. 2021).

Since those cases were decided, the Supreme Court has squarely rejected Hogarth's interpretation of *Reed*. The Court in *City of Austin*

addressed an ordinance prohibiting billboards that advertised off-site businesses. 596 U.S. at 66. Like Hogarth, the plaintiff argued that under *Reed*, "a regulation cannot be content neutral if it requires reading the sign at issue." *Id.* at 69. On that test, the law was content based because enforcement required reading the billboard to identify the advertised business. The Court held that was "too extreme an interpretation of [its] precedent." *Id.* Austin's ordinance was content neutral because it did not "single out any topic or subject matter for differential treatment" and a "sign's substantive message itself [was] irrelevant." *Id.* at 71. The law "require[d] an examination of speech only in service of drawing neutral, location-based lines." *Id.* at 69.

Several courts since *City of Austin* have recognized that *Reed* does not mean "that *any* examination of speech or expression inherently triggers heightened First Amendment concern." *Id.* at 73. *See, e.g.*, *Mazo*, 54 F.4th at 148-50; *Porter v. Martinez*, 68 F.4th 429, 441-43 (9th Cir. 2023). This Court should do the same.

Enforcing the Ballot Photography Provisions requires examining speech only to make the neutral determination of whether a photograph shows a marked ballot. As in *City of Austin*, where the "message on the

sign matter[ed] only to the extent that it inform[ed] the sign's relative location," 596 U.S. at 71, all that matters here is whether the speech occurs during an election (time), on a ballot (place), via voting (manner). No vote, race, or issue is "single[d] out," and the "substantive message" is "irrelevant." *Id.* Determining whether photographs contain marked ballots does not entail "discriminat[ion] based on the topic discussed or the idea or message expressed." *Id.* at 73-74 (cleaned up). The Ballot Photography Provisions are "therefore similar to ordinary time, place, or manner restrictions" and are content neutral. *Id.* at 71.

**2. The Ballot Photography Provisions survive intermediate scrutiny.**

Content neutral restrictions must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). As shown above, Hogarth is free to communicate her desired messages in many ways. *See supra* Section II.A.3. And as shown below, the Ballot Photography Provisions are narrowly tailored to serve significant state interests.

**a. The Ballot Photography Provisions serve significant governmental interests.**

The laws address real, not merely conjectural harms. Hogarth

argues the State must identify a case of vote buying or coercion specifically involving ballot selfies. That "misapprehends the applicable standard." *Ross*, 746 F.3d at 556 n.6. The First Amendment permits legislatures to "draw[] reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997) (cleaned up). States need not "present a panoply of empirical evidence." *Ross*, 746 F.3d at 556. And "when it is obvious that a challenged law serves a significant governmental interest, [courts] do not require that the government produce evidence so demonstrating." *Billups v. City of Charleston, S.C.*, 961 F.3d 673, 685 (4th Cir. 2020). *See also Educ. Media Co. at Va. Tech v. Swecker*, 602 F.3d 583, 589-90 (4th Cir. 2010) (ban on alcohol advertisements in college newspapers obviously served interest of reducing alcohol demand among college students).

The State can reasonably infer from the undisputed historical and contemporary evidence that the Ballot Photography Provisions deter vote buying and intimidation and help maintain faith in elections. *See supra* Section I.A.2-3. When new technology threatens to amplify age-old harms, the First Amendment allows states to be proactive. *Cf. Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 481 (2025) (upholding online

age verification requirements because "proof of age performs the same critical function online that it does in person"). The Ballot Photography Provisions are justified by far more than mere conjecture.

**b. The Ballot Photography Provisions are narrowly tailored.**

Hogarth does not argue that the laws are not narrowly tailored under intermediate scrutiny. That is because intermediate scrutiny does not mandate "the least restrictive or least intrusive means." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). It requires only that the government interest would "be achieved less effectively absent the regulation," and that "the means chosen are not substantially broader than necessary" to achieve that interest. *Id.* at 799-800 (cleaned up). If elections "would be more exposed to harm without" the Ballot Photography Provisions, then "the ban is safe from invalidation under the First Amendment." *Clark*, 468 U.S. at 297.

The undisputed history laid out in *Burson* confirms that the secret ballot deters vote buying and coercion and preserves voter confidence. *See supra* Section I.A.2-3. The Ballot Photography Provisions preserve ballot secrecy and only minimally burden expression. *See supra* Section II.A.3. That suffices given "the latitude [courts] afford the Government

to design regulatory solutions to address content-neutral interests." *TikTok*, 604 U.S. at 77 (cleaned up).

Hogarth suggests just one alternative: standalone prohibitions on vote buying and coercion. But intermediate scrutiny does not require the least restrictive means. *Id.* at 77-78 (collecting cases). Moreover, direct prohibitions proved ineffective in the decades preceding adoption of the secret ballot. *See supra* 19-20. Hogarth ignores that history and points to states that now permit ballot selfies. Br. 30-31. But a "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800. The same must hold true where states disagree on "the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted." *Paxton*, 606 U.S. at 496 (cleaned up).

Flexibility is particularly appropriate here. Because the Ballot Photography Provisions address harms that are difficult to detect, other states' laws cannot establish that North Carolina has "ignore[d] less restrictive approaches already *proven* effective." *TikTok*, 604 U.S. at 78 (emphasis added). In *McCullen*, for example, the Court struck down a

prophylactic restriction because the targeted harms were "anything but subtle" and direct prohibitions were not "difficult" to enforce. 573 U.S. at 495-96. *McCullen* distinguished "the buffer zones in *Burson*," which were justified because "voter intimidation and election fraud are difficult to detect." *Id.* at 496 (cleaned up). *See also Hill v. Colorado*, 530 U.S. 703, 729 (2000) (law's "prophylactic aspect" was "justified by the great difficulty" of targeting only individually harmful interactions).

The fact that other states permit ballot selfies means only that those states are willing to accept more risk to the integrity of their elections. They are free to do so. But under intermediate scrutiny, North Carolina is free to strike a different balance.

**B. The Ballot Photography Provisions are constitutional under strict scrutiny.**

Finally, the Ballot Photography Provisions survive strict scrutiny. *See* JA15; *Silberberg*, 272 F. Supp. 3d at 469. Maintaining election integrity "is an urgent objective of the highest order." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010) (applying strict scrutiny and upholding restriction in national security context). The secret ballot effectively addressed widespread vote buying and intimidation, and elections have become no less important and humankind no less

susceptible to these wrongs in the century since. *Supra* Section I.A.2.

The Ballot Photography Provisions are the least restrictive means of preserving the secret ballot. While "[v]ote buying and voter intimidation are against the law," they "are very difficult to detect," *Silberberg*, 272 F. Supp. 3d at 472, meaning direct prohibitions alone will result in counting illegitimate votes. Direct prohibitions also do not address the compelling interest in maintaining election integrity "by preventing ... more subtle forms [of] coercion ... to enforce orthodoxy in voting." *Id.* at 473; *see also Oettle*, 189 N.E.3d at 27-28.

The "right to vote freely for the candidate of one's choice is … the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). And "[n]o body politic worthy of being called a democracy entrusts the selection of leaders to a process of auction or barter." *Brown v. Hartlage*, 456 U.S. 45, 54 (1982). These laws are thus among the few that survive even strict scrutiny.

## CONCLUSION

Defendants respectfully request that this Court affirm.

Respectfully submitted, this the 1st day of June, 2026.

JEFF JACKSON
Attorney General

Nicholas S. Brod
Solicitor General

/s/ Thad Eagles
Thad Eagles
Deputy Solicitor General

Mary Lucasse
Special Deputy Attorney General

Mary Scruggs
Special Deputy Attorney General

*Counsel for State Board Defendants-Appellees*

Elizabeth Curran O'Brien
Special Deputy Attorney General

*Counsel for Defendant-Appellee Freeman*

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

Roger Askew
County Attorney

Allison P. Cooper
Senior Deputy County Attorney

Wake County Attorney's Office
Post Office Box 550
Raleigh, NC 27602
(919) 856-5500

*Counsel for County Board Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,781 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface: 14-point Century Schoolbook font.

Respectfully submitted, this the 1st day of June, 2026.

/s/ Thad Eagles
Thad Eagles

**CERTIFICATE OF SERVICE**

I certify that on June 1, 2026, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Respectfully submitted, this the 1st day of June 2026.

/s/ Thad Eagles
Thad Eagles