**Case No. 26-1328**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

SUSAN JANE HOGARTH,

*Plaintiff-Appellant,*

v.

SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections; JEFF CARMON, in his official capacity as a Member of the North Carolina State Board of Elections; STACY EGGERS, IV, in his official capacity as Secretary of the North Carolina State Board of Elections; SIOBHAN O'DUFFY MILLEN, in her official capacity as a Member of the North Carolina State Board of Elections; DANIELLE BRINTON, in her official capacity as Investigator for the North Carolina State Board of Elections; OLIVIA MCCALL, in her official capacity as Director of the Wake County Board of Elections; KEITH WEATHERLY, in his official capacity as Chair of the Wake County Board of Elections; ANGELA HAWKINS, in her official capacity as a Member of the North Carolina State Board of Elections; GREG FLYNN, in his official capacity as a Member of the Wake County Board of Elections; GERRY COHEN, in his official capacity as Secretary of the Wake County Board of Elections; LORRIN FREEMAN, in her official capacity as Wake County District Attorney; FRANCIS X. DE LUCA, in his official capacity as Chair of the North Carolina State Board of Elections; STEVEN LONG, in his official capacity as a Member of the Wake County Board of Elections; DONNA WILLIAMS, in her official capacity as a Member of the Wake County Board of Elections,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of North Carolina, No. 5:24-cv-00481
Hon. Louise W. Flanagan

## Plaintiff-Appellant's Reply Brief

James M. Dedman IV
(NC Bar # 37415)
Gallivan White & Boyd P.A.
6805 Carnegie Blvd Ste. 200
Charlotte, NC, 28211
(704)-552-1712
jdedman@gwblawfirm.com

Jeffrey D. Zeman
(Pa. Bar No. 328570)
Cary Davis
(Pa. Bar No. 338042)
Foundation for Individual
Rights and Expression
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
jeff.zeman@fire.org
cary.davis@fire.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ................... 1

ARGUMENT ................................................................................. 3

I.    The Ballot Photography Provisions are Content-Based But Cannot Survive Strict Scrutiny. ..................................................... 3

    A.    Defendants' efforts to avoid strict scrutiny are futile. ............ 4

        1.    *Reagan* does not alter the conclusion that banning ballot selfies is content discrimination. ........................ 6

        2.    *Anderson-Burdick* does not apply because banning ballot selfies does not regulate election "mechanics." ................................................................ 10

        3.    Photos *of* a ballot do not receive nonpublic forum analysis. ...................................................................... 11

    B.    Defendants cannot carry their burden of satisfying strict scrutiny. ................................................................................. 13

        1.    Defendants have not met their burden of establishing evidence-based compelling government interests. .............................................. 14

        2.    An outright ban on taking and sharing photos of a voted ballot is not narrowly tailored to further the Defendants' purported interests. ............................... 19

II.   Defendants cannot show even that the Ballot Selfie Ban provisions are reasonable regulations of a nonpublic forum. ........ 24

    A.    The Voting Enclosure Provision fails the *Mansky* reasonableness test because North Carolina gives officials unlimited discretion to grant or deny permission to take photos. ................................................. 26

    B.    The Ballot Selfie Ban provisions fail the Fourth Circuit's reasonableness test because Defendants do not even attempt to make the required showing. ............................. 28

CONCLUSION ........................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Askins v. U.S. Dep't of Homeland Sec.*,
  899 F.3d 1035 (9th Cir. 2018)........................................................13

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001)..................................................................20, 21

*Bates v. United States*,
  522 U.S. 23 (1997)...................................................................26, 27

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011)............................................................12, 14, 15

*Burdick v. Takushi*,
  504 U.S. 428 (1992)................................................................11, 12

*Burson v. Freeman*,
  504 U.S. 191 (1992)................................................................5, 6, 18

*Camp Hill Borough Republican Ass'n v. Borough of Camp Hill*,
  101 F.4th 266 (3d Cir. 2024)..........................................................9

*Chamber of Com. of the United States of Am. v. Lierman*,
  151 F.4th 530 (4th Cir. 2025) .........................................................9

*Chiles v. Salazar*,
  146 S. Ct. 1010 (2026)............................................................1, 4, 8

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ......................................................................4

*City of Austin v. Reagan National Advertising of Austin*,
  596 U.S. 61 (2022).................................................................passim

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994)......................................................................30

*Coal. for Good Governance v. Kemp*,
  558 F. Supp. 3d 1370 (N.D. Ga. 2021) ...........................................17

*Cohen v. California*,
  403 U.S. 15 (1971).......................................................................31

*Free Speech Coalition, Inc. v. Paxton*,
  606 U.S. 461 (2025)....................................................................1, 4

*Glover v. RDU Airport Auth.*,
No. 5:23-CV-00704-M, 2025 WL 89093 (E.D.N.C. Jan. 14, 2025) .......25

*Hannegan v. Esquire, Inc.*,
327 U.S. 146 (1946) ....................................................................................31

*Holder v. Humanitarian L. Project*,
561 U.S. 1 (2010) ...............................................................................14, 15

*Hubbard v. City of San Diego*,
139 F.4th 843 (9th Cir. 2025) ...................................................................9

*Hulbert v. Pope*,
70 F.4th 726 (4th Cir. 2023) .....................................................................7

*Ind. C.L. Union Found., Inc. v. Ind. Sec'y of State*,
229 F. Supp. 3d 817 (S.D. Ind. 2017) .....................................................17

*Kareem v. Cuyahoga Cty. Bd. of Elections*,
No. 1:20-CV-02457, 2026 WL 1584691 (N.D. Ohio June 3, 2026) .......17

*Kendall v. Balcerzak*,
650 F.3d 515 (4th Cir. 2011) .............................................................10, 11

*La Union del Pueblo Entero v. Abbott*,
167 F.4th 743 (5th Cir. 2026) ..................................................................11

*Mazo v. New Jersey Sec'y of State*,
54 F.4th 124 (3d Cir. 2022) .....................................................................11

*McCullen v. Coakley*,
573 U.S. 464 (2014) ..................................................................................22

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ..................................................................................10

*Mills v. Alabama*,
384 U.S. 214 (1966) ..................................................................................19

*Minnesota Voters Alliance v. Mansky*,
585 U.S. 1 (2018) ...............................................................24, 25, 26, 28

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ..................................................................................14

*Moshoures v. City of N. Myrtle Beach*,
131 F.4th 158 (4th Cir. 2025) ...............................................................9, 10

iii

*Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.*,
991 F.2d 154 (4th Cir. 1993)..............................................25, 29, 30

*News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*,
597 F.3d 570 (4th Cir. 2010)...........................................29, 30, 31, 32

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983)...........................................................................24

*PETA v. N.C. Farm Bureau Fed'n, Inc.*,
60 F.4th 815 (4th Cir. 2023) .........................................................7, 12

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)..................................................................passim

*Rideout v. Gardner*,
123 F. Supp. 3d 218 (D.N.H. 2015) ..................................................17

*Rideout v. Gardner*,
838 F.3d 65 (1st Cir. 2016) ..............................................3, 17, 18, 23

*Rogers v. Madison County Clerk*,
No. 2016-SC-3147, 2017 WL 3475008 (Ill. Cir. Ct. July 20, 2017)......17

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989).........................................................................21

*Schneider v. New Jersey*,
308 U.S. 147 (1939).........................................................................21

*Schrader v. Dist. Att'y of York Cnty.*,
74 F.4th 120 (3d Cir. 2023)................................................................9

*Se. Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975).........................................................................30

*Silberberg v. Board of Elections*,
272 F. Supp. 3d 454 (S.D.N.Y. 2017) ...........................................16, 17

*Snyder v. Phelps*,
562 U.S. 443 (2011).........................................................................19

*Thomas v. Chicago Park District*,
534 U.S. 316 (2002).........................................................................28

*Timmons v. Twin Cities Area New Party*,
520 U.S. 351 (1997).........................................................................12

iv

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) .................................................................14, 15, 17, 23

*Turner Broad. Sys., Inc. v. FCC,*
520 U.S. 180 (1997) .................................................................................17

*United States v. Grace,*
461 U.S. 171 (1983) .................................................................................12

*United States v. McLean,*
808 F.2d 1044 (4th Cir. 1987) ............................................................16, 23

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000) ...................................................................2, 14, 19, 21

*United States v. Shatley,*
448 F.3d 264 (4th Cir. 2006) ...................................................................23

*United States v. Simms,*
914 F.3d 229 (4th Cir. 2019) ...................................................................27

*United States v. Smilowitz,*
974 F.3d 155 (2d Cir. 2020) .....................................................................16

*United States v. Stevens,*
559 U.S. 460 (2010) .............................................................................27, 28

*Village of Schaumburg v. Citizens for a Better Env't,*
444 U.S. 620 (1980) .................................................................................21

*Walden v. Kosinski,*
153 F.4th 118 (2d Cir. 2025) ...............................................................11, 12

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ...................................................................................7

*Wash. Post v. McManus,*
944 F.3d 506 (4th Cir. 2019) ............................................................2, 16, 17

*White Coat Waste Project v. Greater Richmond Transit Co.,*
35 F.4th 179 (4th Cir. 2022) ...................................................................25

*Wisconsin v. Buzzell,*
No. 2022-CF-000361 (Wis. Cir. Ct., Nov. 27, 2023) .............................17

## INTRODUCTION AND SUMMARY OF ARGUMENT

North Carolina's Ballot Selfie Ban is a quintessential content-based restriction on speech: Photographs of an elector's own filled-out ballot subject North Carolinians to criminal prosecution while photos of unmarked ballots—or any other means of conveying how they voted—do not. But the Supreme Court made clear "the First Amendment's jealous protections for the individual's right to think and speak freely" mean "laws regulating speech based on its … communicative content are presumptively unconstitutional" and receive strict scrutiny. *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026). Strict scrutiny is "fatal in fact absent truly extraordinary circumstances," and is "unforgiving because it is the standard for reviewing the direct targeting of fully protected speech." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 484–85 (2025). Defendants here cannot meet that "unforgiving" test. *Id.* at 484.

Defendants in their Response fail to carry the state's burden to establish a compelling interest, offering only conjecture about how ballot selfies theoretically could factor into attempted voter fraud while failing to provide a single example—from anywhere, *ever*—of a ballot selfie facilitating voter fraud. Defendants thus fail to "meaningfully

1

demonstrate" that its asserted interest in banning ballot selfies is "impelled by the facts on the ground," a fatal deficiency under strict scrutiny. *Wash. Post v. McManus*, 944 F.3d 506, 521 (4th Cir. 2019).

Defendants likewise fail to meet their burden on strict scrutiny's narrow tailoring prong, which requires the government to use the "least restrictive means" when regulating speech based on its content. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 827 (2000). Indeed, they do not contest that North Carolina and federal law already prohibit vote buying, voter intimidation, and voting fraud, the very malfeasance they insist criminally banning ballot selfies is needed to combat.

Unable to pass either prong of strict scrutiny and survive its rigorous test, Defendants ask this Court to assign a different exam, but to no avail. They claim the Ballot Selfie Ban is only a "time, place, or manner" regulation, but that standard applies only to regulations on *when* and *where*—not *whether*—expression may occur. Defendants alternatively ask the Court to apply the test applicable to regulating the mechanics of conducting elections, ignoring that banning ballot selfies restricts speech *about* elections not the conduct of the election itself. They also argue the ban should face only nonpublic forum analysis, ignoring not only that it

2

restricts speech *about* the ballot rather than use of the ballot, but also that it restricts ballot selfies even in traditional public forums like parks and on sidewalks.

Defendants' attempt to justify the Voting Enclosure Provision fares no better. They cannot explain how a grant of unbridled authority to election officials to grant or deny permission to engage in expression squares with *Mansky*'s holding prohibiting precisely that. Nor can Defendants' justification pass the common sense test, as North Carolina permits a plethora of other picture-taking in the polling place.

The First Circuit has already held ballot selfie bans violate the First Amendment, explaining the restriction violates even *intermediate* scrutiny. *Rideout v. Gardner*, 838 F.3d 65, 72 (1st Cir. 2016). This Court should join its sister circuit, vacate the decision below, and order entry of judgment on the pleadings for Appellant Hogarth.

## ARGUMENT

### I. The Ballot Photography Provisions are Content-Based But Cannot Survive Strict Scrutiny.

The Ballot Photography Provisions are content-based restrictions subject to strict scrutiny because they regulate a particular type of content: taking and sharing photos of voted ballots. Defendants principally

3

defend against strict scrutiny by trying to avoid it, pivoting to inapplicable tests governing the mechanics of *holding* elections rather than speech about elections, and speech restrictions on nonpublic property. The reason for Defendants' attempted diversions is no secret: the test for content-based speech restrictions "is the most demanding test known to constitutional law." *Free Speech Coalition*, 606 U.S. at 484 (internal quotation omitted). Defendants must, but cannot, meet their burden of demonstrating that the Ballot Photography Provisions serve compelling interests or are the least restrictive means of accomplishing those interests. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (explaining "laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction" satisfies strict scrutiny) (internal quotation omitted).

### A.    Defendants' efforts to avoid strict scrutiny are futile.

Attempting to avoid strict scrutiny's "demanding standard," *Chiles*, 146 S. Ct. at 1021, Defendants throw a variety of theories against the wall, none of which stick. They invoke the Supreme Court's decision in *City of Austin v. Reagan National Advertising of Austin*, 596 U.S. 61 (2022), as a talisman against the basic rules of content-based regulation

in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), but *Reagan* did not silently upend *Reed* and decades of First Amendment doctrine governing when strict scrutiny applies. Nor are the Provisions here mere "time, place, or manner" regulations, (Defs.' Resp. Br., Doc. 27 at 52–53), as they regulate *what* voters can say, not just where or when they can say it. And they do not regulate election "mechanics," (Doc. 27 at 45–50), as they target speech merely *about* elections rather than the process of voting. For similar reasons, nonpublic forum analysis does not apply, (Doc. 27 at 33–34), because the Provisions restrict speech *about* ballots not their use to vote, and the rules apply far away from government and other nonpublic property.

Ballot selfies' proximity to an election does not change bedrock First Amendment law on content discrimination. Even right outside the polling place door, content-based regulations of speech trigger strict scrutiny. *See Burson v. Freeman*, 504 U.S. 191, 207 (1992). Defendants' repeated reliance on *Burson* is thus baffling, as the Court there expressly held that, even within 100 feet of a polling place, "distinguishing among types

5

of speech requires that the statute [face] strict scrutiny." *Id.*[1] That is what the Ballot Photography Provisions do, and that is the test they must (but cannot) survive.

### 1. *Reagan* does not alter the conclusion that banning ballot selfies is content discrimination.

The Supreme Court has been clear—even in *Reagan*—that content discrimination occurs when a law differentiates based on "the topic discussed or the idea or message expressed." 596 U.S. at 69–72 (quoting *Reed*, 576 U.S. at 163). That is precisely what the Ballot Photography Provisions do. They single out taking and sharing a single type of picture—those of completed ballots—and subject them to criminal punishment. That means strict scrutiny applies. *Reed*, 576 U.S. at 164.

Defendants' Response attempts to avoid strict scrutiny by rebranding the Ballot Photography Provisions as "neutral" time, place, or manner

---

[1] Defendants incorrectly claim *Burson* applied a "modified" strict scrutiny test. (Doc. 27 39–40). Not so. The Court merely held the state need not prove a 25-foot buffer would not work as well as a 100-foot buffer under the least-restrictive-means test because that was a difference "only in degree," not "in [the] kind" of regulation employed." 504 U.S. at 209–10. Here, however, the Ballot Photography Provisions are an independent "kind" of restriction, triggering the same strict scrutiny *Burson* applied to the restrictive boundary.

restrictions. (Doc. 27 at 52–53.) Defendants are wrong. Closing a park at 10 p.m. is a "time, place, or manner" restriction. Completely prohibiting ballot selfies at any time, in any place, in any manner, is a content-based speech regulation. As this Court has explained, time, place, and manner analysis applies only if a law regulates "when, where, or how speech may be delivered" but not "anything related to the message" substance the speaker seeks to convey. *Hulbert v. Pope*, 70 F.4th 726, 733–34 (4th Cir. 2023); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 799 n.7 (1989) (noting difference between time, place, or manner restriction and "total ban").

Defendants' attempt to side-step *Reed* finds no safe harbor in *Reagan.* As this Court explained, *Reagan* ultimately "reaffirmed *Reed*'s 'straightforward' conclusion that 'a regulation of speech cannot escape classification as facially content based' … 'simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy ….'" *PETA v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 830 (4th Cir. 2023) (quoting *Reagan*, 596 U.S. at 74). Defendants note they ban ballot selfies "regardless of race, issue, or candidate," (Doc. 27 at 51.), but the First Amendment demands *content* neutrality, not just partisan or viewpoint

7

neutrality. Banning ballot selfies is no more content "neutral" than banning all photographs of food "regardless of type-of-cuisine, nationality-of-origin, or chef." Nor does banning ballot selfies regulate the "manner" of taking photos but rather imposes penalties based on the photo's "topic discussed." That's a content-based speech restriction. *Reagan*, 596 U.S. at 69–71.

Defendants contend *Reagan* supplanted *Reed*'s content-discrimination test such that, so long as a restriction is viewpoint-neutral, it is content-neutral. But viewpoint discrimination and content discrimination remain different things, the former a subset of the latter. *See, e.g.*, *Chiles*, 146 S. Ct. at 1024 (calling viewpoint discrimination "an egregious form of content discrimination") (cleaned up). If anything, *Reagan* reaffirmed *Reed*'s rule that when laws either expressly "single out any topic or subject matter," or have "a content-based purpose or justification," they are content-based and trigger strict scrutiny. 596 U.S. at 69, 70.

This Court's post-*Reagan* decisions confirm *Reed*'s ground rules still apply. For example, it explained that a noise regulation distinguishing types of music "based solely on the type of 'language' being broadcast" was "textbook content discrimination" regardless of "proffered content-

neutral justifications." *Moshoures v. City of N. Myrtle Beach*, 131 F.4th 158, 167 (4th Cir. 2025) (banning "obscene, profane or vulgar [broadcasts] from any commercial property" violated First Amendment). Likewise, it held Maryland's law on how advertisers communicate with customers about the state's digital advertising tax was "content based," reasoning it "distinguishe[d] lawful speech from unlawful based on what it says." *Chamber of Com. of the United States of Am. v. Lierman*, 151 F.4th 530, 536, 540 (4th Cir. 2025). Other circuits have also consistently held post-*Reagan* that laws singling out particular subjects are content based, including those targeting "noncommercial messages," *Camp Hill Borough Republican Ass'n v. Borough of Camp Hill*, 101 F.4th 266, 269 (3d Cir. 2024), "information about 'child abuse,'" *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 127 (3d Cir. 2023), and even "teaching yoga," *Hubbard v. City of San Diego*, 139 F.4th 843, 851 (9th Cir. 2025).

The Ballot Photography Provisions also have the "content-based purpose," *Reagan*, 596 U.S. at 69, of preventing people from conveying a specific message through photography: who they actually voted for. Defendants concede "North Carolina [] prohibits taking and sharing photographs of official marked ballots" because it wishes to prevent other

voters "from seeing how votes are cast." Doc. 27 at 2, 39. Restricting a type of communication *because of* its communicative content "is textbook content discrimination." *Moshoures*, 131 F.4th at 167 (internal quotation marks and citation omitted).

### 2. *Anderson-Burdick* does not apply because banning ballot selfies does not regulate election "mechanics."

Defendants also seek shelter from strict scrutiny in the *Anderson-Burdick* test, (Doc. 27 at 45–50), but that applies only to regulations of the "mechanics of the electoral process" like filing deadlines, voter eligibility, ballot access, or vote-by-mail availability. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–46 (1995). It does not apply to regulations of "pure speech" *about* an election, *id.*, or that single out speech based on content. *Kendall v. Balcerzak*, 650 F.3d 515, 525 (4th Cir. 2011).

In *McIntyre*, the Court refused to apply *Anderson-Burdick* to a regulation that singled out leaflets "designed to influence the voters," holding it regulated not the "voting process itself" but the content of communications, triggering strict scrutiny. 514 U.S. at 337–38, 344–47, & n.10. Likewise, *Kendall* reaffirmed that, while the state can impose content-neutral requirements for referendum signatures under a lesser

10

burden, content-based regulations of "the communicative aspect of petitioning" or those restricting "pure speech" *about* an election require strict scrutiny. 650 F.3d at 525.

Notably, all of Defendants' proffered authority on this point, (Doc. 27 at 47), involved textbook regulation of election mechanics, not election-related speech. *Burdick v. Takushi*, 504 U.S. 428 (1992) involved limiting voters' ability to vote for write-in candidates. *Walden v. Kosinski*, 153 F.4th 118 (2d Cir. 2025), and *Mazo v. New Jersey Sec'y of State*, 54 F.4th 124 (3d Cir. 2022), involved restrictions on candidates' appearances on the ballot. And *La Union del Pueblo Entero v. Abbott* involved paid collection of ballots and paid in-person electioneering "in the presence of the ballot or during … voting." 167 F.4th 743, 753 (5th Cir. 2026). More notably, none support bypassing strict scrutiny here.

### 3. Photos *of* a ballot do not receive nonpublic forum analysis.

Defendants' attempt to avoid strict scrutiny by reducing review of the Ballot Photography Provisions to nonpublic forum analysis likewise fails. Not only does each case Defendants cite, (Doc. 27 at 33–34), involve election laws regulating how candidates appear *on* the ballot, none

11

conducted a forum analysis in any event.[2] Despite this, Defendants leap to the conclusion that because courts have held *the ballot itself* is not an open forum for public discussion, any expression *containing an image* of a ballot must be subject to nonpublic forum jurisprudence.

Even if wording *on* a ballot were a nonpublic forum, Defendants still conflate speech *in* a nonpublic forum with speech *about* one. Photographing the United States Supreme Court from First Street does not receive the same analysis as taking a picture inside the courtroom.[3] In *United States v. Grace*, 461 U.S. 171 (1983), the Supreme Court invalidated a prohibition on demonstrations on the Court's bordering sidewalks, explaining that:

---

[2] *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 354, 369–70 (1997) (upholding law prohibiting "appearing on the ballot as the candidate of more than one party"); *Burdick*, 504 U.S. at 441–42 (upholding Hawaii's ban on write-in candidates); *Walden v. Kosinski*, 153 F.4th 118, 141–42 (2d Cir. 2025) (upholding New York's prohibition on candidates appearing on ballot as "Independent").

[3] Defendants are also wrong to assert that "taking pictures only implicates the First Amendment when the photographs are meant to be shared." (Doc. 27 at 33 (citing *PETA*, 60 F.4th at 829).) While *PETA* held protecting the right to take a photograph is as important as the right to share one, it did not tether that right *to* sharing. 60 F.4th at 829 (holding the "'creation' of information demands as much protection as its 'dissemination.'"). Whether a restriction "applies to creating, distributing, or consuming speech makes no difference" to the First Amendment. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 792 n.1 (2011).

12

> Traditional public forum property occupies a special position in terms of First Amendment protection and will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression.

*Id.* at 180. *See also Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1038 (9th Cir. 2018) (reversing and remanding for factual findings on whether sidewalks where photographers shot U.S. port of entry were sufficiently public, to determine whether to apply traditional public forum or nonpublic forum analysis). Defendants cite no law, and we can locate none, holding the government can subject speech to nonpublic forum analysis when it is created or shared outside a nonpublic forum.

****

Each of Defendants' efforts to avoid strict scrutiny fail because banning and sharing ballot selfies based on what they communicate is content-based regulation of speech requiring strict scrutiny.

## B. Defendants cannot carry their burden of satisfying strict scrutiny.

The Ballot Photography Provisions fail the demanding test of strict scrutiny because they are not the narrowly-tailored least restrictive means of achieving a compelling government interest. *Reed*, 576 U.S. at 163. Defendants cannot satisfy the compelling interest prong because

13

they provide no evidence ballot selfies create "an 'actual problem' in need of solving." *Brown*, 564 U.S. at 799 (quoting *Playboy Ent. Grp., Inc.*, 529 U.S. at 822–23). Nor do they explain how banning *all* ballot selfies is the least restrictive means of furthering the asserted interests when existing statutes directly address those interests.

> **1.    Defendants have not met their burden of establishing evidence-based compelling government interests.**

The Ballot Photography Provisions cannot survive strict scrutiny because Defendants provide no evidence the harms they argue arise from ballot selfies "are real, not merely conjectural." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) ("*Turner I*"). Banning ballot selfies to stop voters from communicating for whom they voted is "very much related to the suppression of free expression," which is "not [a] valid, let alone substantial" government interest. *Moody v. NetChoice, LLC*, 603 U.S. 707, 740 (2024).

Defendants justify their content-based restrictions on this political speech by arguing that "[m]aintaining election integrity 'is an urgent objective of the highest order.'" (Doc. 27 at 57 (quoting *Holder v.*

14

*Humanitarian L. Project*, 561 U.S. 1, 28 (2010))).[4] But making that observation is not identifying here a specific "'actual problem' in need of solving." *Brown*, 564 U.S. at 799. While "preserving the privacy of other voters, avoiding delays and distractions at the polls, preventing vote buying, and preventing voter intimidation," (Doc. 27 at 12), might be "important in the abstract," Defendants must do more than "simply posit the existence of the disease sought to be cured." *Turner I*, 512 U.S. at 664–66. Yet their 71-page response contains not a shred of evidence (much less *North Carolina*-based evidence) linking ballot selfies to the harms posited.

Defendants instead scour the country and deep into history—including to 1892 Connecticut—for evidence that someone, somewhere, has committed voting offenses. But there is nothing in Defendants' nearly two-dozen, continent-spanning citations connecting photos of voted

---

[4] To be clear, *Holder* has nothing to do with elections; it discusses the First Amendment boundaries of an anti-terrorism statute. *Holder*, 561 U.S. at 8–9. Defendants merely found a case using the phrase "is an urgent objective of the highest order" and passed it off as about elections. Even then, when dealing with the "urgent objective" of protecting the country from terrorist attacks, the Court carefully segmented out "pure political speech" from "material support [for terrorism] in the form of conduct." *Id.* at 28.

ballots to any of it. *United States v. McLean*, for example, involved prosecution of a precinct registrar who personally oversaw bribed voters casting ballots. 808 F.2d 1044, 1045 (4th Cir. 1987). In *United States v. Smilowitz*, the defendant fraudulently registered voters by lying about their residences. 974 F.3d 155, 157–58 (2d Cir. 2020). None of the cases involved using pictures of voted ballots to facilitate election fraud. Defendants accordingly cannot meet their burden to show the asserted interests in banning ballot selfies are "impelled by the facts on the ground." *McManus*, 944 F.3d at 521.

Defendants' heavy reliance on *Silberberg v. Board of Elections*, 272 F. Supp. 3d 454 (S.D.N.Y. 2017), hurts their case by showing what New York had but North Carolina lacks. Defendants cite *Silberberg* 22 times, (Doc. 27 at 13–17, 19, 22–23, 30, 32–34, 42, 45, 57–58), but fail to mention it is an outlier among ballot-selfie cases in relying on extensive testimony confirming New York's unique history of rampant voter fraud. 272 F. Supp. 3d at 469, 471. And even so, *Silberberg* reflects no history of photos facilitating fraud. *Id.* at 475. In any event, the far better comparators are the half-dozen opinions invalidating ballot selfie bans for, as here, lack of

16

evidence demonstrating a problem in need of solving and a solution not "impelled by the facts on the ground." *McManus*, 944 F.3d at 521.[5]

Unlike New York in *Silberberg*, Defendants provide no evidence, legislative history, or expert testimony supporting their sweeping assertion that vote-buying schemes "would be far easier to accomplish" with legal ballot selfies. (Doc. 27 at 26.) *Compare Turner I*, 512 U.S. at 664 (holding regulation failed even intermediate scrutiny absent evidence of "real" rather than conjectural harms), *with Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195–97 (1997) ("*Turner II*") (ultimately upholding regulation after government provided expert testimony and extensive evidence before Congress pre-enactment). Defendants stress the "threat to ballot secrecy" ballot selfies assertedly pose, (Doc. 27 at 4, 39–41, 55),

---

[5] *Rideout v. Gardner*, 838 F.3d 65 (1st Cir. 2016); *Coal. for Good Governance v. Kemp*, 558 F. Supp. 3d 1370, 1386 & n.11 (N.D. Ga. 2021); *Ind. C.L. Union Found., Inc. v. Ind. Sec'y of State,* 229 F. Supp. 3d 817, 828 (S.D. Ind. 2017); *Rideout v. Gardner*, 123 F. Supp. 3d 218, 230 (D.N.H. 2015), *aff'd*, 838 F.3d 65; *Rogers v. Madison County Clerk*, No. 2016-SC-3147, 2017 WL 3475008 (Ill. Cir. Ct. July 20, 2017); *Wisconsin v. Buzzell,* No. 2022-CF-000361 (Wis. Cir. Ct., Nov. 27, 2023). *But see Kareem v. Cuyahoga Cty. Bd. of Elections*, No. 1:20-CV-02457, 2026 WL 1584691 (N.D. Ohio June 3, 2026). *Kareem* upheld a prohibition on photographing ballots but relied on Ohio's expert-testimony-supported evidence of voter fraud to justify a ban applicable equally to both marked and unmarked ballots, *i.e.*, those expressing a political preference but also blank ones.

17

but requiring voters to keep their ballots secret is the speech restriction itself—not an underlying interest justifying it. Defendants' focus on the "viva voce" regime shows the error, because the colorful, publicly-visible ballots permitted others to see how voters voted even if the voters did not wish it. (Doc. 27 at 18–22.) Ballot selfies are the opposite: voters can decide for themselves whether to share their ballot.

Defendants' heavy reliance on *Burson* to justify the Ballot Photography Provisions is misplaced. There, the Supreme Court considered only an interest in protecting voters from other people within 100 feet of polling places, 504 U.S. at 193–94, which as the First Circuit explained in striking down a ballot selfie ban, is "obviously distinguishable," because its "discussion … of the long history of regulating polling places" made clear "the interest at stake … centered on the protection of physical election spaces." *Rideout*, 838 F.3d at 73. That is quite different from what a voter wishes to convey about their own already-voted ballot.

Finally, Defendants argue "more subtle forms of coercion" like "societal influences," "exposure to public opinion," and "disapprobation" justify banning ballot selfies. (Doc. 27 at 22–23 (citations omitted).) As a threshold matter, voters taking and sharing ballot selfies opt to expose

18

themselves to those reactions, and can avoid doing so easily. In any event, people disagreeing with others' political choices and saying so is democracy in action. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose … was to protect the free discussion of governmental affairs," including "of course … discussions of candidates." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). It is simply not a valid government interest to suppress speech in the name of avoiding "vehement, caustic, and sometimes unpleasant expression." *See Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (cleaned up).

> **2. An outright ban on taking and sharing photos of a voted ballot is not narrowly tailored to further the Defendants' purported interests.**

Not only do Defendants fail to support a legitimate (let alone compelling) governmental interest, they do not show the Ballot Photography Provisions are narrowly tailored and the "least restrictive means" of achieving their asserted interests, as strict scrutiny requires. *Playboy Ent. Grp., Inc.*, 529 U.S. at 827. That is primarily because the Provisions fail narrow tailoring under strict (or even intermediate) scrutiny given

existing laws that directly address the asserted interests without bur-

dening political speech:

| Asserted Harm (*See* Doc. 27 at 12–27) | Laws Addressing Asserted Harm (*See* Opening Br., Doc. 24 at 33–34) |
|---|---|
| Vote buying or selling. | • N.C. Gen. Stat. § 163-275(2) makes vote buying or selling a jailable offense.<br>• 18 U.S.C. § 597 punishes vote buying or selling with up to two years in prison. |
| Coercing or intimidating voters. | • N.C. Gen. Stat. § 163-274(a)(7) criminalizes coercing or intimidating voters.<br>• N.C. Gen. Stat. § 163-48 requires officials to prevent intimidation at polling places.<br>• 52 U.S.C. § 10307(b) prohibits intimidating or coercing voters. |
| Delaying an election by remaining in the voting booth too long. | • N.C. Gen. Stat. § 163-273(a)(5) criminalizes delaying an election by remaining in the voting booth longer than allowed. |
| Interfering with other voters. | • N.C. Gen. Stat. § 163-273(a)(3)–(4) criminalizes interfering with, or attempting to interfere with, other voters in the voting enclosure or when marking their ballots. |
| Voter privacy. | • N.C. Gen. Stat. § 163-166.2 requires officials to organize voting enclosures to ensure voters can vote in secret. |

The Supreme Court has been clear the "normal method of deterring

unlawful conduct" is through laws like these that target unlawful con-

duct, not speech. *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). Yet

Defendants fail to explain why North Carolina's existing election integ-

rity laws, which directly criminalize and address their asserted harms

without infringing on speech, are inadequate. (*See* Doc. 24 at 33–35.)

20

Rather, Defendants ignore Supreme Court precedent requiring narrow tailoring through least restrictive means,[6] in favor of simply asserting that, "If Hogarth is correct, then the State must ignore [voter fraud], wait until its voters and the integrity of its elections are injured, hope the scheme is uncovered, then return to court for permission to enforce…." (Doc. 27 at 3.) But that is a specious proposition.

First, Defendants can enforce the panoply of election laws listed above that Hogarth does not challenge. Second, waiting for a violation of the law before enforcement is the "normal method of deterring unlawful conduct" that police and prosecutors use every day by investigating crimes, seeking warrants, and filing charges. That is why, for example, the First Amendment requires states to investigate solicitation fraud instead of banning all solicitation, *Village of Schaumburg*, 444 U.S. at 637, and to find and prosecute those who illegally intercept information instead of those who innocently publish it, *Bartnicki*, 532 U.S. at 529. The First Amendment requires that North Carolina do no less for voter fraud.

---

[6] *See* Doc. 24 at 34–35 (discussing *Schneider v. New Jersey*, 308 U.S. 147, 164 (1939); *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980); *Playboy Ent. Grp.*, 529 U.S. at 825–26; *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989)).

Under strict and intermediate scrutiny, narrow tailoring requires Defendants show North Carolina "seriously undertook to address the problem with less intrusive tools readily available to it" and that it "considered different methods that other jurisdictions have found effective." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014). Defendants do neither. Their brief ignores the "less intrusive tools readily available" to argue as though the choice is between banning ballot selfies and rampant electoral fraud (which Defendants fail to provide evidence occurs in any of the 31 states where ballot selfies are legal (*see* Doc. 24 at 30)).

Defendants insist "direct prohibitions" against vote buying and coercion were ineffective before states shielded other people from seeing voters' votes by eliminating hand-raising and bring-your-own-colorful-ballot voting. (Doc. 27 at 56.) While that may show the utility of *permitting* voters to keep their ballots secret—it does not show that *compelling* them to keep their votes secret is the least restrictive means of achieving the State's interests.

It is Defendants' burden to "demonstrate that alternative measures that burden substantially less speech would fail …, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495. That is why the First

22

Circuit held that "even accepting the possibility that ballot selfies will make vote buying and voter coercion easier," banning ballot selfies fails even intermediate scrutiny tailoring. *Rideout*, 838 F.3d at 74. (*Compare* Doc. 27 at 26 (arguing without evidence that ballot selfies make fraud "easier"); *id.* at 56 (asserting, again without support, that ballot selfies make detecting voter fraud more "difficult")).

Defendants also fail to provide evidence that "the regulation will in fact alleviate" their "recited harms" in "a direct and material way" as narrow tailoring also requires. *Turner I*, 512 U.S. at 664. The two North Carolina voter fraud cases Defendants cite, (Doc. 27 at 23–24), prove Hogarth's point: the government caught and successfully prosecuted the perpetrators under federal statutes directly criminalizing conspiracy and vote buying. *See United States v. Shatley*, 448 F.3d 264, 265 (4th Cir. 2006); *McLean*, 808 F.2d at 1045.

Defendants concede Hogarth could "take a selfie in the voting enclosure, and in that picture, she can point to her candidate on an unmarked or sample ballot. And she can post or publish that picture wherever she likes …." (Doc. 27 at 44.) But according to North Carolina, photographing a voted ballot is somehow a bridge too far, and banning

23

that is the only thing standing between the sanctity of elections and rampant voter fraud. Common sense, and North Carolina's history of prosecuting voter fraud with voter fraud laws, lays that to rest.

## II. Defendants cannot show even that the Ballot Selfie Ban provisions are reasonable regulations of a nonpublic forum.

The Ballot Photography Provisions and Voting Enclosure Provision violate voters' First Amendment rights inside the polling place because Defendants have not met their burden to show they are "reasonable" regulations of speech in a nonpublic forum. The Supreme Court has long held that although the government may "preserve the property under its control for the use to which it is lawfully dedicated," it must show any restrictions on speech therein are "reasonable." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). In *Minnesota Voters Alliance v. Mansky*, the Supreme Court held that one way a speech restriction can be unreasonable is failing "to articulate some sensible basis for distinguishing what may come in from what must stay out," 585 U.S. 1, 16 (2018), a test the Voting Enclosure Provision fails by giving officials unbridled discretion to permit or deny voters' requests to photograph themselves in the voting enclosure.

24

Further, contrary to Defendants' protestations, (Doc. 27 at 37–38), *Mansky* does not provide the only way speech regulations can fail the "reasonableness" requirement, and both before and after *Mansky* this Court has employed a balancing test "akin to … intermediate scrutiny." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 198 (4th Cir. 2022) (after); *see Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 162 (4th Cir. 1993) (before). And district courts continue to apply that test, including as recently as last year. *See, e.g., Glover v. RDU Airport Auth.*, No. 5:23-CV-00704-M, 2025 WL 89093, at *2 (E.D.N.C. Jan. 14, 2025) (banning rideshare driver from airport grounds for saying "ass" in parking lot was unreasonable under Fourth Circuit test, not *Mansky*'s). The Voting Enclosure Provision and the Ballot Photography Provisions fail this Court's "reasonableness" test because Defendants fail to demonstrate that infringing voters' free speech rights furthers the state's asserted interests given other statutes that already directly do so.

**A.    The Voting Enclosure Provision fails the *Mansky* reasonableness test because North Carolina gives officials unlimited discretion to grant or deny permission to take photos.**

The Voting Enclosure Provision fails *Mansky* reasonableness because, by granting officials unbridled discretion to grant or deny voters permission to photograph themselves, it fails "to articulate some sensible basis for distinguishing what may come in from what must stay out." 585 U.S. at 16. Defendants cite nothing in the provision's language, or any other provision of North Carolina law, that limits officials' discretion. Instead, they invoke separate statutes requiring ballot officials to perform their duties "fairly and impartially" and to help maintain "peace and good order," arguing *those* limit discretion to instances "where there is no risk of 'disorder' or 'disruption.'" (Doc. 27 at 29.) Put differently, Defendants urge this Court to misuse canons of construction to read language into the Voting Enclosure Provision that is not there.

Yet Defendants cite no support for their argument that the Court should (or can) import, from a separate statute, election officials' general duty to maintain order as a limitation on the Voting Enclosure Provision. Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). The

26

canon of constitutional avoidance Defendants invoke, (Doc. 27 at 29), is only available "if such a reading is fairly possible after the application of ordinary textual analysis." *United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019) (cleaned up). Because nothing in the text of the Voting Enclosure Provision opens it up to "'more than one plausible construction,' the canon of constitutional avoidance 'simply has no application.'" *Id.* This Court cannot "rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain." *United States v. Stevens*, 559 U.S. 460, 481 (2010).

To the contrary, because North Carolina "includes particular language" preventing disorder and disruption in other sections of its elections laws, (*see supra* Part I.B., listing statutes), the Court should presume the legislature "acted intentionally and purposely" in omitting such language from the Voting Enclosure Provision, "another section of the same Act." *Bates*, 522 U.S. at 29–30. That leaves officials' power to deny selfies unbound.

All that remains are Defendants' promises during this litigation of evenhanded, sensible enforcement, (Doc. 27 at 28–29), but the First Amendment "does not leave us at the mercy of *noblesse oblige*," and this

27

Court may not "uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Stevens*, 559 U.S. at 480 (citations omitted).

Defendants try to minimize their fatal *Mansky* problem by labeling Hogarth's argument "formalist," deeming "more explicit specificity" in the Voting Enclosure Provision's language "unrealistic." (Doc. 27 at 29.) It is unclear what point Defendants are making beyond quarreling with *Mansky*'s underpinnings (and the void-for-vagueness doctrine's requirement) that laws must supply sufficient guardrails to government officials to prevent arbitrary enforcement. Citing *Thomas v. Chicago Park District* does not help, (*id.*), because the ordinance at issue there expressly enumerated grounds upon which officials could deny a permit. 534 U.S. 316, 324 (2002). Bottom line: No guidance "capable of reasoned application" exists here. *Mansky*, 585 U.S. at 23.

> **B.    The Ballot Selfie Ban provisions fail the Fourth Circuit's reasonableness test because Defendants do not even attempt to make the required showing.**

The Ballot Selfie Ban also fails this Court's test for speech restrictions in a nonpublic forum because it is unreasonable to single out photos of voted ballots and voters' selves while permitting all other

photography, particularly when other North Carolina statutes directly address Defendants' asserted interests in regulating polling places. (*See supra* Part I.B.) This Court's "reasonableness" test requires balancing the "degree and character of the impairment of protected expression involved" against the "validity of any asserted justification for the impairment." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 577 (4th Cir. 2010) (quoting *Multimedia Publ'g*, 991 F.2d at 159). The Ballot Photography Provisions and Voting Enclosure Provision fail because Defendants do not "counterbalance" these "significant" restrictions on speech with evidence that restricting that speech advances the asserted interests. *Id.* at 579–81.

As explained above, (*see supra* Part I.B.), existing North Carolina and federal statutes already account for Defendants' interests in prohibiting voter fraud. What's left is infringement on every North Carolinian's political speech, without increased protection against the state's asserted harms. Defendants nonetheless insist the Ballot Selfie Ban is permissible because "Hogarth can communicate her desired messages in any number of [alternate] ways." (Doc. 27 at 44.) But that is constitutionally irrelevant.

The Supreme Court has been clear that, even on the government's property, it cannot limit free speech "on the plea that it may be exercised in some other place," *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556 (1975) (citation omitted), or some other way. Rather, availability of "another medium … to carry the same messages" does not lessen the burden to justify speech restrictions. *City of Ladue v. Gilleo*, 512 U.S. 43, 56, 57 n.16 (1994). As this Court explained in *News & Observer* in invalidating an airport ban on newspaper racks, a "total" ban on a particular type of expression is a "significant[]" impairment of speech, regardless of other avenues of communication. 597 F.3d at 578. Yet Defendants' "attempt" to counterbalance their significant impairment of voters' speech, by distinguishing the Ballot Selfie Ban from the content-based restrictions invalidated in *Multimedia* and *News & Observer*, amounts to three conclusory words: "Not so here." (Doc. 27 at 38).

Defendants' arguments for banning ballot selfies in polling places—disruption, delay, and invasion of privacy—also fail to account for the significant photography *permitted* under North Carolina law. Voters can already photograph:

- Their unmarked ballot;

- Poll workers;

- Their "I Voted" sticker;

- Voting machines;

- The arrangement of voting booths;

- Themselves with an unmarked ballot (but, due to the Voting Enclosure Provision, only after taking additional time to capture the attention of an elections official and obtain permission); and

- Friends and family (if, under the Voting Enclosure Provision, they take additional time to seek and obtain permission from the subject of the photograph and the election official).

The Ballot Selfie Ban thus defies "common sense and logic" given the plethora of other photography permitted in the polling place. *News & Observer*, 597 F.3d at 578.[7]

---

[7] Defendants argue that, other than voted ballots or voters, there is "little of interest" to photograph. (Doc. 27 at 17.) But that is not for the government to decide. *See Hannegan v. Esquire, Inc.*, 327 U.S. 146, 158 (1946) ("What seems to one to be trash may have for others fleeting or even enduring values."); *Cohen v. California*, 403 U.S. 15, 25 (1971) ("[W]e think it is largely because governmental officials cannot make principled distinctions … that the Constitution leaves matters of taste and style so largely to the individual.").

In *News & Observer*, for example, this Court explained that the airport newsrack ban flunked "common sense and logic" because the airport authority "proffered no justification to distinguish newsracks from the vending machines, racks displaying brochures, ATM machines, and other visual obtrusions that existed[.]" *Id.* at 579. Defendants likewise cannot explain here why ballot selfies are uniquely likely to cause the asserted harms.

At bottom, North Carolina can prevent all of the harms Defendants assert by using existing statutes directly criminalizing their speculated misconduct. (*See supra* Part I.B.) Singling out ballot selfies for disparate treatment adds nothing other than censoring speech based on its content, which cannot outweigh voters' "significant" interest in engaging in core political speech.

## CONCLUSION

This Court should reverse the district court's judgment and, as explained in Hogarth's opening brief, remand with instructions to enter judgment on the pleadings in favor of Hogarth.

32

Dated: June 22, 2026                    Respectfully submitted,

                                        /s/ *Jeffrey D. Zeman*

James M. Dedman IV                      Jeffrey D. Zeman
(NC Bar # 37415)                        (Pa. Bar No. 328570)
GALLIVAN WHITE & BOYD P.A.              Cary Davis
6805 Carnegie Blvd Ste. 200             (Pa. Bar No. 338042)
Charlotte, NC, 28211                    FOUNDATION FOR INDIVIDUAL
(704)-552-1712                          RIGHTS AND EXPRESSION
jdedman@gwblawfirm.com                  510 Walnut St., Ste. 900
                                        Philadelphia, PA 19106
                                        (215) 717-3473
                                        jeff.zeman@fire.org
                                        cary.davis@fire.org

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies under Federal Rule of Appellate Procedure 32(g) that Plaintiff-Appellant's Reply Brief meets the applicable formatting, volume, typeface, and style requirements. This brief was prepared in Microsoft Word in 14-point proportionally spaced font and contains 6481 words, excluding items identified under Federal Rule of Appellate Procedure 32(f).

Dated: June 22, 2026                    /s/ *Jeffrey D. Zeman*
                                        Jeffrey D. Zeman
                                        FOUNDATION FOR INDIVIDUAL
                                        RIGHTS AND EXPRESSION

34